UNITED STATES DISTRICT COURT      ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ENERGY BRANDS INC. d/b/a GLACÉAU,     :
                                   :
               Plaintiff,         :
                                   :     08 Civ. 4909 (JSR)
         v.                      :
                                   :
NATIONAL BEVERAGE CORP.,           :
                                   :
              Defendant.       :
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>DEFENDANT'S MOTION TO DISMISS, STAY OR TRANSFER</u>

LOTT & FRIEDLAND, P.A.
Leslie J. Lott
New York Bar No. 1633130
355 Alhambra Circle, Suite 1100
Coral Gables, Florida 33114
Tel: (305) 448-7089
Fax: (305) 446-6191
Email: ljlott@lfiplaw.com

*Attorneys for Defendant,*
*National Beverage Corp.*

Dated: Miami, Florida
        August 7, 2008

TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS..................................................................................2

      a.    NBC and its ÀSANTÉ brand product  ...............................................2

      b.    Glaceau and its vitaminwater brand product  .................................4

      c.    The Current Controversy  ....................................................................6

III.  ARGUMENT...........................................................................................................10

      a.    Under the First-Filed Rule, This Court Should Defer to the Florida Court. .........10

      b.    The Balance of Convenience Weighs in Favor of the Florida Forum. ................12

            i.    The Locus of Operative Facts Is in Florida. .............................................12

            ii.   The Convenience and Relative Means of the Parties Favors Florida. ......13

            iii.  The Convenience of Witnesses and Location of Evidence Favors
                  Florida. ...................................................................................................14

            iv.   Glaceau's Choice of Forum Is Entitled to Little Weight. .........................15

            v.    The Florida Forum Is Familiar with the Governing Law. ........................16

            vi.   The Florida Forum Better Serves the Interests of Justice.  .......................17

      c.    No Special Circumstances Exist Which Justify a Departure from the
            First-Filed Rule. .........................................................................................18

            i.    The Florida Action Is Not An Anticipatory Filing. ...................................18

            ii.   NBC Did Not Engage in Forum Shopping...................................................22

            iii.  The Florida Action Is Not a "Hip-Pocket" Filing. ...................................23

      d.    Transfer of Venue Is Proper. ........................................................................24

IV.   CONCLUSION .......................................................................................................25

TABLE OF AUTHORITIES

FEDERAL CASES

Page

*800-Flowers, Inc. v. Intercontinental Florist, Inc.,*
860 F. Supp. 128 (S.D.N.Y 1994) ..................................................................12, 13, 15, 16, 18

*AbovePeer, Inc. v. Recording Indus. Ass'n of Am.,*
166 F. Supp. 2d 655 (N.D.N.Y. 2001)................................................................................12, 16

*B&E Juices, Inc. v. Energy Brands, Inc.,*
Case No. 07-cv-1321, D. Conn. (2007), Defendant's Proposed Findings of Fact and
Conclusions of Law .............................................................................................................5

*Curtis et al. v. Citibank, N.A. et al.,*
226 F.3d 133 (2nd Cir. 2000)............................................................................................10

*Employers Insurance of Wausau et al. v. Fox Entertainment Group, Inc. et al.,*
522 F.3d 271 (2nd Cir. 2008)...................................................................................11, 18, 22

*Employers Insurance of Wausau v. The Prudential Insurance Company of America et al.,*
763 F. Supp. 46 (S.D.N.Y. 1991) ....................................................................................19

*Energy Brands Inc. d/b/a Glaceau v. Pepsico, Inc. and South Beach Beverage
Company, Inc.,* Case No. 06 Civ. 2662, S.D.N.Y. (2006), Complaint ...........................2

*Frederick Goldman, Inc. v. Trent West, et al.,*
2007 U.S. Dist. LEXIS 50259 at *8 (S.D.N.Y.)...............................................................17

*J. Lyons & Company Ltd. et al. v. The Republic of Tea, Inc. et al.,*
892 F. Supp. 486 (S.D.N.Y. 1995) ......................................................................14, 18, 19, 22

*James v. AT&T Corporation et al.,*
334 F. Supp. 2d 410 (S.D.N.Y. 2004) ..............................................................................10

*Learning Networks, Inc. v. Discovery Communications, Inc.,*
11 Fed. Appx. 297 (4th Cir. 2001)....................................................................................20

*McCain v. Rahal Letterman Racing, LLC,*
2007 U.S. Dist. LEXIS 63091 at *7 (S.D.N.Y.)....................................................15, 24, 25

*MedImmune, Inc. v. Genentech, Inc., et al.,*
127 S.Ct. 764 (2007)..................................................................................................17, 21, 25

*MSK Insurance, Ltd. v. Employers Reinsurance Corp.,*
212 F. Supp. 2d 266 (S.D.N.Y. 2002) .....................................................................................11

*Neil Bros., Ltd. v. World Wide Lines, Inc.,*
396 F. Supp. 2d 340 (E.D.N.Y. 2005) .....................................................................................17

*Remington Arms Company, Inc. et al. v. Federal Cartridge Company,*
2004 U.S. Dist. LEXIS 3848 at *8 (M.D.N.C.)........................................................................23

*SanDisk Corporation v. STMicroElectronics, Inc.,*
480 F.3d 1372 (Fed. Cir. 2007) ..............................................................................................21

*Schnabel v. Ramsey Quantitative Systems, Inc.,*
322 F. Supp. 2d 505 (S.D.N.Y. 2004) ...............................................................12, 18, 19, 22

*Schieffelin & Co. v. The Jack Co. of Boca, Inc., et al.,*
725 F. Supp. 1314 (S.D.N.Y. 1989) .................................................................................12, 13

*Supreme International Corp. v. Anheuser-Busch, Inc.,*
972 F. Supp. 604 (S.D. Fla. 1997) ..........................................................................................11

*Surefoot LC v. Sure Foot Corporation,*
2008 U.S. App. LEXIS 14327 at *17-18 (10th Cir.) ...............................................................21

*U.S.A. v. Nature's Farm Products, Inc.,*
2004 U.S. Dist. LEXIS 8485 at *13 (S.D.N.Y.) .......................................................................15

*Xoxide, Inc. v. Ford Motor Co.,*
448 F. Supp. 2d 1188 (C.D. Cal. 2006) ..................................................................................23

## STATUTES

15 U.S.C. § 1114.......................................................................................................................9

15 U.S.C. § 1125.......................................................................................................................9

28 U.S.C. § 1391.....................................................................................................................24

28 U.S.C. § 1404(a) ...........................................................................................................12, 24

28 U.S.C. §§ 2201...............................................................................................................17, 21

28 U.S.C. §§ 2202...................................................................................................................17

MISCELLANEOUS

Fed. R. Civ. P. 4(m) .........................................................................................................24

*Functional Solution*, Beverage Spectrum, November-December 2007 at 26-35. ...............1, 2, 8

Defendant, National Beverage Corporation ("NBC") submits this memorandum of law in support of its motion to dismiss, stay or transfer this action.

## I.    **INTRODUCTION**

Plaintiff Energy Brands Inc. d/b/a Glaceau ("Glaceau"), a subsidiary of the mega-sized Coca-Cola Company ("Coca-Cola"), is the recognized leader in marketing enhanced water. Its **vitaminwater** brand product has held the vast majority of sales for several years.    By comparison, NBC is a small company.

Six months ago, in a major trade journal, NBC introduced its ÀSANTÉ brand product into the enhanced water market; the announcement appeared on the page immediately before Glaceau's new **vitaminwater** product entrants.[1] Glaceau waited six months after the ÀSANTÉ industry announcement, and then demanded that NBC change its ÀSANTÉ packaging based upon a transparently weak claim that the ÀSANTÉ packaging infringed the **vitaminwater** label and trade dress. Clearly, the timing could not have been accidental. It coincided with the beginning of the critical first summer soft drink season for ÀSANTÉ. Glaceau's letter raised a substantial, actual, real and immediate controversy requiring a declaration of rights. NBC knew that giants like Coca Cola and its subsidiaries could strike anywhere and at any time in an attempt to disrupt product distribution and sales.   Accordingly, NBC filed *National Beverage Corp. v. Energy Brands, Inc. d/b/a Glaceau*, Case No. 08-cv-60792, in its home jurisdiction, the Southern District of Florida (the "Florida Action"), the jurisdiction in which it resides, and in which officers, decision-makers, witnesses and documents are located.  In response, Glaceau filed this retaliatory action not in its home jurisdiction, but in its lawyer's home court, the

---

[1] Exhibit A, Cover page and excerpt from BEVERAGE SPECTRUM, November-December 2007. Glaceau announced vitaminwater xxx and vitaminwater b-relaxed.

1

Southern District of New York, and has forced the parties to engage in wasteful and expensive motion practice when it could simply have filed an Answer and Counterclaim in the Florida Action.

This Court should grant NBC's motion to dismiss, stay or transfer this action because neither the balance of convenience nor any special circumstances require departure from the well-settled first-filed rule. This matter should proceed in Florida rather than New York.

## II.  STATEMENT OF FACTS

### a.  NBC and its ÀSANTÉ brand product

Through its various operating subsidiaries, NBC develops, manufactures and distributes soft drinks, bottled waters, juices and juice products, energy drinks and powders, and sells its products under a number of trademarks, including ÀSANTÉ.  NBC's primary ÀSANTÉ packaging – including its unique multi-color label – is depicted in Exhibit B.

In the beverage industry, the most critical season for sales of non-alcoholic beverages (including enhanced water) is the summer,[2] a fact recognized by Glaceau.[3] The unofficial kickoff date of the summer season is Memorial Day. Hilden Declaration ¶ 9.

NBC announced the launch of ÀSANTÉ in November 2007, in the widely read *Beverage Spectrum* magazine,[4] and commenced distribution in January 2008 to acquire goodwill for the brand in advance of its critical first summer season. Hilden Declaration ¶¶ 10-11.

---

[2] Declaration of Vickie L. Hilden in Support of Defendant's Motion to Dismiss, Stay or Transfer, submitted herewith ("Hilden Declaration") ¶ 8.

[3] Exhibit C, Cover page and excerpt from Glaceau's Complaint in *Energy Brands Inc. d/b/a Glaceau v. Pepsico, Inc. and South Beach Beverage Company, Inc.*, Case No. 06-cv-2662, S.D.N.Y. (2006) ¶¶ 26, 28 (stating that the majority of Glaceau's 2006 budget for **vitaminwater** would be spent on its "Summer campaign", and that roughly half of its expected sales would be made in the summer months)

[4] *See* footnote 1, *supra* at 1.

**LOTT & FRIEDLAND, P.A.** • 355 Alhambra Circle • Suite 1100 • Coral Gables, Florida  33134
(305) 448-7089 • (305) 446-6191 telecopier

NBC's size and market share pales in comparison to Coca-Cola and its Glaceau subsidiary. NBC employs approximately 1300 persons. In fiscal year 2008, its total annual revenue, for *all* of its products, was $566 million. All of its operations are directed from its headquarters in Plantation, Florida, where a majority of its corporate officers and senior management personnel work. ÀSANTÉ is manufactured in Warren, Michigan by its wholly-owned subsidiary Sundance Beverage Company ("Sundance"), but all decisions on brand names, formulas, packaging, and other manufacturing issues are either made in or directed from the Plantation headquarters. Hilden Declaration ¶¶ 12-17.

NBC's anticipated witnesses will be management personnel who reside in the Southern District of Florida; the documents and evidence relating to ÀSANTÉ are also located in Florida. Hilden Declaration ¶¶ 18-19. Under the allegations of the complaints in both this action and the Florida Action, it is NBC's conduct that will be at issue before the Court, not Glaceau's.

ÀSANTÉ is sold only in the U.S., and, to date, in a limited number of cities. Of the 95,759 cases sold as of May 31, 2008, only 486 – less than one truckload – were sold in New York. This represents approximately one half of one percent (.5%) of total sales. The New York sales were made to an independent distributor located in the Bronx not owned or controlled by NBC. Also as of that date, nearly (8) times that amount had been sold in Florida (3,764 cases). Hilden Declaration ¶¶ 20-24.

These *de minimis* sales to a New York distributor represent NBC's only connection to the State of New York. NBC does not maintain any offices or employees in New York, is not registered to do business in New York, and does not have a registered agent in New York. NBC has not participated in federal litigation in New York. None of NBC's potential fact witnesses

3

are located in New York, and none of the documents or evidence relating to ÀSANTÉ are located in New York.  Hilden Declaration ¶¶ 25-28.

### b.  Glaceau and its vitaminwater brand product

Glaceau has offered its **vitaminwater** brand enhanced beverage product since 1999.[5]    It owns three United States Trademark Registrations for marks containing the term "vitaminwater," namely: Reg. No. 3,009,857 for **GLACEAU VITAMINWATER** to identify non-alcoholic flavored drinking water, Reg. No. 2,974,987 for **VITAMINWATER** to identify vitamin enhanced flavored drinking water, and Reg. No. 2,975,087 for **GLACEAU VITAMINWATER and Design** to identify non-alcoholic flavored drinking water, which design consists of a bottle label, as shown in Exhibit E, Certificate of Registration.  The bottle and label as used by Glaceau on its **vitaminwater** brand product are depicted in Exhibit F.[6]

Glaceau sells more enhanced water than anyone else in the industry.   In 2007, the entire industry sold 231.7 million gallons of enhanced water, and Glaceau accounted for nearly one-third of the total.[7]  Also in 2007, Glaceau's U.S. revenues from **vitaminwater** alone were $635 million – more than $70 million more than NBC's revenues for *all* of its products in its most recent fiscal year – representing over $1.4 billion in retail revenue.  In 2008, Glaceau expects its revenue to exceed $1 billion. [8]  In 2007 alone, Glaceau spent over $100 million in advertising and promoting this particular product, and has budgeted to spend well in excess of that amount in 2008.  DE 3, First Amended Complaint, ¶ 22.

---

[5] Exhibit D, Cover page and excerpts from Glaceau's Motion to Dismiss, or in the Alternative, Stay or Transfer the Florida Action ("Glaceau's Motion to Dismiss"), page 2.
[6]  The bottle is not proprietary to Glaceau. Indeed, it is one of the most commonly used bottle designs in the beverage industry.
[7] Exhibit G, "Winn-Dixie V-H2O. Can It Float More Sales?", *The Florida Times Union*, November 1, 2007.
[8] Exhibit H, Cover page and excerpt from Declaration of J. Darius Bikoff in Support of Glaceau's Motion to Dismiss ("Bikoff Declaration"), ¶ 4.

4

Glaceau is a wholly-owned subsidiary of Coca-Cola.[9] In 2007, Coca-Cola paid $4.1 billion to acquire Glaceau. Glaceau is now maintained as a business unit within Coca-Cola North America.[10] The top three directors of Glaceau are Coca-Cola employees located in Atlanta, Georgia.[11] Coca-Cola and Glaceau dwarf NBC in terms of resources and sales.[12]

In fact, in connection with its acquisition by Coca-Cola, Glaceau terminated many of its independent distributors, including B&E Juices, Inc. ("B&E"), and utilized Coca-Cola's distribution network, the Coca-Cola Bottlers (the "Bottlers"), for distribution throughout the U.S. The Bottlers is the largest network in the U.S., and has more resources nationally than most of the other distribution companies combined, including: over one million coolers and 1.2 million vending machines, access to food service accounts, such as McDonalds and Subway, as well as colleges and schools; and the ability to visit chain stores twice a day, seven days per week (compared to B&E's ability to visit once or twice a week).[13] Thus, Glaceau has already availed itself of the vast resources that Coca-Cola has to offer.

---

[9] DE 2, Rule 7.1 Corporate Disclosure Statement of Glaceau.

[10] Exhibit I, Excerpt from "News Release", www.thecoca-colacompany.com, May 25, 2007.

[11] Exhibit J, Florida Department of State Division of Corporations ("FDSDC") Record for Energy Brands Inc.

[12] To highlight Glaceau's vast resources compared to NBC, its parent Coca-Cola is a global company. It owns four of the world's top five non-alcoholic sparkling beverage brands. It employs 90,500 people worldwide, or more than sixty times the number of people employed by NBC, and reaches over 200 countries. Every day, 1.5 billion servings of Coca-Cola's 2,800 beverage products are consumed. Exhibit K, Excerpt from "Behind the Brand", www.thecoca-colacompany.com. In 2007, Coca-Cola's revenue was more than $28 billion, or nearly fifty times the revenue earned in 2007 by NBC. Exhibit L, Cover page and excerpt from The Coca-Cola Company 2007 Annual Review.

[13] Exhibit M, Cover page and excerpt from Glaceau's Proposed Findings of Fact and Conclusions of Law in B&E Juices, Inc. v. Energy Brands, Inc., Case No. 07-cv-1321, D. Conn. (2007), p. 17-18.

5

Glaceau is incorporated and headquartered in Whitestone, New York, which is located in the *Eastern* District of New York, not the Southern District where Glaceau filed this suit.[14] Coca-Cola is incorporated in Delaware and headquartered in Atlanta, Georgia. Both Glaceau and Coca-Cola are registered to do business in Florida and have registered agents in Plantation, Florida.[15] Coca-Cola is familiar with litigating in Florida. According to court records, in the past twenty (20) years, Coca-Cola or its subsidiaries have been involved in five (5) lawsuits in Florida federal district courts, including as a plaintiff.[16]

### c. **The Current Controversy**

On May 19, 2008, the week before Memorial Day and the eve of the summer soft drink season, Glaceau sent NBC a letter objecting to the ÀSANTÉ product packaging and trade dress and alleging violation of Glaceau's trade dress in its **vitaminwater** product packaging.[17] The letter does not threaten litigation. It does not advise that Glaceau intends to file suit. It does not name a date by which it will bring suit. It does not name a court, nor attach a draft complaint. Instead, the letter states that it is an attempt "to determine whether this dispute can be amicably resolved", and "expressly reserves [Glaceau's] right to seek judicial intervention." The letter seeks a response by May 28, 2008 and states that, if it does not receive same, Glaceau's counsel will advise it to "proceed accordingly." The letter also specifically details Glaceau's previous conquests against competitors over similar issues, and indicates that a copy of the letter is being sent to an attorney at Coca-Cola.

---

[14] Exhibit J; Exhibit N, Excerpt from Whitestone Community Profile, www.epodunk.com; Exhibit O, Excerpt from U.S. District Courts Eastern District of New York Webpage.
[15] Exhibit J; Exhibit P, Excerpt from FDSDC Record for The Coca-Cola Company.
[16] Exhibit Q, a true and correct printout from the LexisNexis database.
[17] Exhibit R, Letter of David H. Bernstein to Vickie L. Hilden.

6

NBC promptly acknowledged receipt and undertook a good faith investigation to determine the merit of Glaceau's claims.[18] NBC's letter advises that it will investigate the claims and "provide a full response…shortly".  It neither requests additional time to investigate and respond, nor suggests that NBC will discuss settlement.

After examining the trade dress of Glaceau and other beverage products in the marketplace, the relevant case law, and comparing the **ÀSANTÉ** and **vitaminwater** trade dress side by side (as shown below and in Exhibit T), NBC reached the conclusion that Glaceau's infringement claims were baseless.  Hilden Declaration ¶ 34.

 

---

[18] Exhibit S, Letter of Vickie L. Hilden to David H. Bernstein, May 20, 2008; Hilden Declaration ¶ 32-33.

7

NBC also concluded that the timing of Glaceau's letter was strategic. It had been four months since the launch of ÀSANTÉ, and six months since the announcement in Beverage Spectrum. NBC was particularly concerned, because there could be no legitimate claim that Glaceau had been surprised. The *Beverage Spectrum* cover story was about vitamin enhanced waters and detailed all of the many new entrants into Glaceau's market. It featured NBC's ÀSANTÉ and Glaceau's two newest **vitaminwater** flavors on successive pages. Given Glaceau's much larger distribution system, NBC concluded that **vitaminwater** was in all of the same markets as ÀSANTÉ. Under the circumstances, NBC believed that Glaceau *must have known* about ÀSANTÉ long before it sent the May 19 letter.[19] Hilden Declaration ¶¶ 35-37.

All of this was viewed in the context of NBC's knowledge of the anti-competitive tactics that characterize the beverage market. Glaceau was known to have attacked other competitors over similar issues. Further, Glaceau was now funded by Coca-Cola, the industry giant worldwide and a fierce competitor. Taken as a whole, the facts led NBC to the belief that Glaceau intended to intimidate it and its distributors and to interrupt the forward momentum of ÀSANTÉ during its critical first summer season. NBC did not believe that Glaceau intended to

---

[19] Glaceau claims that it had no knowledge of NBC's ÀSANTÉ product until April 25, 2008, when one of its district sales managers reported seeing the product in a gas station. Exhibit U, Cover page and excerpt from Declaration of Carol Dollard in Support of Glaceau's Motion to Dismiss ("Dollard Declaration"), ¶5-7 and Exhibit A thereto. This is simply not a credible claim in light of the *Beverage Spectrum* article and the fact that beverage companies generally make it a point to know what is in the market. It is literally incredible that no one at Glaceau or associated with Glaceau noticed the article, or saw or heard about the ÀSANTÉ product, for six months, especially since over 2 million bottles had been distributed in the market by the time Glaceau raised its objection. Further, even assuming NBC knew that Glaceau was not aware of ÀSANTÉ until April 25, it would still have viewed the delay of the cease and desist letter until May 19 as suspicious: the fact that Glaceau waited over three weeks to notify NBC of its supposedly serious concerns would have suggested to NBC that the delay was intentional.

8

file suit in the near future – indeed, its letter did not suggest this.[20]   Rather, NBC believed Glaceau simply intended to hold the threat of potential litigation "over its head," and to intimidate potential ÀSANTÉ buyers and distributors in the marketplace. Hilden Declaration ¶¶ 38-43.

NBC had three options: it could either succumb to anti-competitive pressure from the industry giant and forego the summer season; advise Glaceau that it believed its trade dress infringement claims were baseless and then wait and see if, when and where Glaceau might bring suit; or immediately seek a declaration of its rights in an effort to achieve certainty.   As a business decision, there was no choice. Promptly, on May 23, 2008, NBC filed for declaratory judgment in the Southern District of Florida  Hilden Declaration ¶ 44-46.

In the Florida Action, NBC seeks a declaration that its ÀSANTÉ product packaging and trade dress do not infringe, unfairly compete with or otherwise violate Glaceau's trademark and trade dress rights, if any, including under 15 U.S.C. § 1114 and 1125 or any other federal or state law.  The week after NBC filed the Florida Action, Glaceau filed this action on May 28, 2008, alleging trade dress infringement under 15 U.S.C. § 1114 and 1125 and related state law causes of action. DE 1, Complaint.  That same day, only two business days after filing the Florida Complaint[21], counsel for NBC, on the instructions of its client, telephoned counsel for Glaceau for the purpose of requesting that he accept service of the Florida Complaint.  Hilden Declaration ¶ 49. Both complaints were served on May 29.  On June 2, three business days after filing this action, Glaceau amended its complaint and for the first time alleged claims for infringement of

---

[20] In fact, Glaceau itself supports NBC's interpretation of the letter as not threatening immediate litigation: Glaceau refers to the letter as an effort "to determine whether an amicable resolution of this dispute could be found."  Glaceau's Motion to Dismiss, page 3; Bikoff Declaration ¶ 8. The letter itself purports to "reserve rights."
[21] The intervening Monday, May 26 was a holiday, namely Memorial Day.

LOTT & FRIEDLAND, P.A. • 355 Alhambra Circle • Suite 1100 • Coral Gables, Florida  33134
(305) 448-7089 • (305) 446-6191 telecopier

its **VITAMINWATER** trademark and dilution of its trademark and trade dress.[22] <u>DE 3</u> ¶¶ 27-44.

## III.    <u>ARGUMENT</u>

### a.    <u>Under the First-Filed Rule, This Court Should Defer to the Florida Court.</u>

The Second Circuit recognizes that a district court has broad discretion to stay or dismiss a suit which is duplicative of another federal suit. *Curtis et al. v. Citibank, N.A. et al.*, 226 F.3d 133, 138 (2nd Cir. 2000). "Generally, a suit is duplicative if the 'claims, parties, and available relief do not significantly differ between the two actions.'" *James v. AT&T Corporation et al.*, 334 F. Supp. 2d 410, 411 (S.D.N.Y. 2004) (internal citations omitted). In this case, the Florida Action and this action are duplicative: the parties are identical, and because the claims are all based on federal and state trademark and trade dress protection, the claims and available relief

---

[22] Glaceau maintains as well that it was not aware that NBC used the phrase, "nutritionally enhanced flavored vitamin water," on its label until it reviewed the Florida Complaint, which it obtained through the Court's PACER system on May 27, because "[u]ntil that time, [it] had focused on the ÀSANTÉ trade dress, as depicted on the www.asantewater.com website, and had not noticed the illegible type on the website images where the label uses the phrase 'VITAMIN WATER.' In light of that new and troubling fact...Glaceau instructed its counsel to file its [original] complaint in the United States District Court for the Southern District of New York [on May 28]." <u>Bikoff Declaration</u> ¶¶ 10, 12. There are several inconsistencies in this statement. First, it is again literally incredible that Glaceau did not notice NBC's use of the words "vitamin water" before May 27, since ÀSANTÉ was in the market for six months and since it received actual samples of the ÀSANTÉ product by no later than May 2, and then received a flyer for the product, both of which clearly and legibly display the words "vitamin water". <u>Dollard Declaration</u> ¶ 5 and Exhibit B thereto. Second, even assuming that Glaceau did not notice NBC's use of "vitamin water" until May 27, it is very surprising that Glaceau did not include claims for infringement and dilution of its allegedly "famous and distinctive" VITAMINWATER trademark in the May 28 filing. Instead, it amended its complaint on June 2 to include such claims. This fact suggests that Glaceau was scrambling to get its original complaint on file as quickly as possible, and thus missed several key claims.

10

are nearly identical.[23]  Both actions arise out of the same set of operative facts, namely NBC's

production, distribution, advertising, sale, and packaging of its ÀSANTÉ product.

The Second Circuit also recognizes a strong presumption that in cases involving parallel

actions, the action that was filed first should be allowed to proceed, and the second abated.

*Employers Insurance of Wausau et al. v. Fox Entertainment Group, Inc. et al.*, 522 F.3d 271,

274-75 (2nd Cir. 2008).  Courts will make an exception to this rule in cases where the balance of

convenience or special circumstances give priority to the second action.  *Id.* at 275-76.

This District has repeatedly found that "[i]t is the court in which the first-filed action was

brought that should decide whether an exception to the first-filed rule applies."  The Southern

District of Florida follows this rule as well. [24]   *See, e.g., Supreme International Corp. v.

Anheuser-Busch, Inc.*, 972 F. Supp. 604, 607 (S.D. Fla. 1997).  Glaceau implicitly recognized

that principle by addressing its motion on the issue to the Florida Court.

Under the *well-settled* rule that the court in which the second action was filed should

defer to the court in which the first action was filed, this Court should dismiss, stay, or transfer

this action to the Southern District of Florida, which is the court that should decide whether the

---

[23] NBC has sought, and the Florida Court has granted, leave to amend its Complaint in that action to add as part of the declaratory judgment request any matters that were not at issue at the time the original Complaint was filed – including the issues first raised by Glaceau in its Amended Complaint in this Action.

[24] See, e.g., *MSK Insurance, Ltd. v. Employers Reinsurance Corp.*, 212 F. Supp. 2d 266, 267-68 (S.D.N.Y. 2002) (collecting cases).  The Court expressly rejected Southern District of New York precedent in which the *second-filed* complaint was filed in this District but the Court nevertheless made a determination as to which action should proceed:

> [T]here is no indication in those cases, however, that this Court stopped to consider whether it was the appropriate body to make this determination before doing so….As such, we do not read these cases as challenging the *well-settled rule* that "the court in which the first-filed case was brought decides the question of whether or not the first-filed rule, or, alternatively, an exception to the first-filed rule applies.

*Id.* at 268, n. 5 (emphasis added, internal citations omitted).

11

first-filed rule, or an exception, applies.[25]  But even if this Court were the proper court to make

that determination, it should defer to the Florida venue because neither the balance of

convenience nor any special circumstances gives priority to this action.

### b.  The Balance of Convenience Weighs in Favor of the Florida Forum.

In determining whether the balance of convenience gives priority to the second-filed

action, the courts of the Second Circuit consider the same factors used in deciding a motion to

transfer venue under 28 U.S.C. § 1404(a), including:

1) the locus of operative facts;
2) the convenience of the parties;
3) the convenience of the witnesses;
4) the location of relevant documents and the relative ease of access to sources of proof;
5) the availability of process to compel the attendance of unwilling witnesses; [26]
6) the relative means of the parties;
7) the weight accorded a plaintiff's choice of forum;
8) the forum's familiarity with the governing law; and
9) trial efficiency and the interests of justice, based on the totality of the circumstances.[27]

In this action, the balance of convenience weighs in favor of the Florida forum.

### i.  The Locus of Operative Facts Is in Florida.

"The locus of operative facts is traditionally an important factor to be considered in

deciding where a case should be tried." *800-Flowers, Inc.*, 860 F. Supp. at 134 (internal citations

omitted). The *Schieffelin* case is instructive on this point.  The defendants were based in Florida

and sold their product nationwide. However, New York sales were a majority of the total sales.

---

[25] This Court has advised that, following the full briefing of and oral argument on the instant motion and with the consent of the parties, it could communicate with the Florida Court to determine which action should go forward.

[26] NBC does not at this time anticipate that any of its or Glaceau's witnesses will be unwilling. Accordingly, the "availability of process to compel unwilling witnesses" factor is neutral.

[27] *Schnabel v. Ramsey Quantitative Systems, Inc.*, 322 F. Supp. 505, 515-16 (S.D.N.Y. 2004); *AbovePeer, Inc. v. Recording Indus. Ass'n of Am.*, 166 F. Supp. 2d 655, 659 (N.D.N.Y. 2001); *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 133 (S.D.N.Y 1994).

12

On this basis, the Court found: "In sum, it is not unfair to defendants to make them litigate in New York, after they have availed themselves of New York markets for more than half the sales of their product." *Schieffelin & Co. v. The Jack Co. of Boca, Inc., et al.*, 725 F. Supp. 1314, 1321 (S.D.N.Y. 1989).

In this action we have precisely the opposite situation. In Florida, NBC has sold nearly eight times the amount of ÀSANTÉ product it has sold in New York. Proportionately, NBC's sales in New York are far less than its sales in Florida, and in most other cities. It would not be unfair to make Glaceau litigate in Florida, where it has consistently and extensively availed itself of the Florida market for its sales, for a significant period of time.

By alleging that NBC was infringing upon its trade dress, Glaceau affirmatively put NBC's conduct at issue. Such conduct has occurred almost entirely in Florida: the majority of NBC's corporate officers and senior management personnel are located in Florida, and all manufacturing decisions related to the ÀSANTÉ product are either made in or driven from its Plantation, Florida headquarters. Given the weight attached to this factor, it militates strongly in favor of the Florida forum.

### ii.  The Convenience and Relative Means of the Parties Favors Florida.

In considering the convenience of the parties, the Courts consider their respective resources. *800-Flowers, Inc.*, 860 F. Supp. at 134. As in *800-Flowers*, NBC is a far smaller corporation than plaintiff with significantly fewer financial resources. Glaceau earned revenues of $635 million in one year on **vitaminwater** *alone*. Glaceau can afford to spend $100 million per year on advertising solely for its **vitaminwater** product. As part of Coca-Cola, Glaceau has a significant advantage over NBC in terms of size, resources, and ability to litigate in a distant forum. Both Glaceau and Coca-Cola have substantial contacts in the Southern District of

13

Florida, via sales, registration as foreign corporations doing business in Florida, and the presence of registered agents in Plantation, Florida (located within the Southern District of Florida). Finally, Coca-Cola has litigated in Florida on numerous occasions, and been able to bear the burden of doing so.[28]

In contrast, NBC is dwarfed in size and resources when compared to Glaceau. Its annual revenue, for *all* of its products, is more than $70 million less than that of Glaceau's for its **vitaminwater** product alone. It would bear a "significant and disproportionate economic burden" if forced to litigate in New York where it has no personnel, no presence and is not licensed to do business. *J. Lyons & Company Ltd., et al. v. The Republic of Tea, Inc., et al.,* 892 F. Supp. 486, 492 (S.D.N.Y. 1995).

On balance, Glaceau would be far less inconvenienced and more financially able to litigate in Florida than NBC would be to litigate in New York. Accordingly, this factor weighs in favor of Florida.

### iii. The Convenience of Witnesses and Location of Evidence Favors Florida.

NBC's potential witnesses and documentary evidence are located in Florida. As it is only the conduct, decisions and actions of NBC that are at issue in the pleadings as presently framed, these factors weigh heavily in favor of the Florida forum.

---

[28] Glaceau attempts to distance itself from Coca-Cola by noting that it is a separately incorporated company and is still run from Glaceau's offices in New York, rather than from Coca-Cola's offices in Atlanta, Georgia. Dollard Declaration, ¶ 3. However, the facts that Glaceau has availed itself of the Coca-Cola Bottlers' massive distribution network, and that Glaceau's May 19 letter to NBC was copied to an attorney at Coca-Cola, evidence Glaceau's close relationship with Coca-Cola and Coca-Cola's vested interest in the outcome of this litigation.

14

### iv.  Glaceau's Choice of Forum Is Entitled to Little Weight.

> [N]ormally there is a presumption in favor of a plaintiff's choice of forum…that
> weighs heavily against transfer.  However,…the plaintiff does not reside in
> the district where he brought the case and the case has little to do with that
> district, plaintiff's choice of forum is entitled to less deference and is not
> sufficient in itself to prevent transfer.

*McCain v. Rahal Letterman Racing, LLC*, 2007 U.S. Dist. LEXIS 63091 at *11 (S.D.N.Y.)

(internal citations omitted); *800-Flowers, Inc.*, 860 F. Supp. at 134 (less deference given when

locus of operative facts has little connection to chosen forum).  This is just such a case.  Glaceau

did not file its lawsuit in its home district and instead chose this district, to which its only

connections are the fact that its counsel is located here and the fact that it has previously received

favorable trade dress rulings here.  The first connection is irrelevant: "'Convenience of counsel is

not a consideration in the transfer analysis.'" *U.S.A. v. Nature's Farm Products, Inc.*, 2004 U.S.

Dist. LEXIS 8485 at *13 (S.D.N.Y.) (internal citation omitted).  The second connection weighs

in favor of the Florida forum, because it evidences Glaceau's intent to forum-shop.  In its Motion

to Dismiss Glaceau admits as much:

> NBC's declaratory judgment complaint reflects …[an] effort to… deprive
> [Glaceau] of the right to seek adjudication of this dispute in its *preferred* forum,
> the Southern District of New York, a court that is *already familiar* with
> VITAMINWATER-related actions…

Glaceau's Motion to Dismiss, page 7 (emphasis added).  NBC seeks legal relief in the district in

which it is headquartered.  In contrast, Glaceau seeks relief in the Southern District of New

York, but is headquartered in the *Eastern* District.[29]  The Southern District is Glaceau's

---

[29] Glaceau attempts to liken its filing in a district which is not its home district to NBC's filing in
a division which is not its home division.  Exhibit V, Cover page and excerpts from Glaceau's
Reply in Support of its Motion to Dismiss ("Glaceau's Reply"), page 2, page 8 FN 6.  This
argument fails for two reasons.  First, although it filed in the Miami courthouse, it was not
NBC's decision to remain in the Miami Division of the Southern District of Florida.  In fact,
NBC checked the box marked "Broward" (its home county) for "County Where Action Arose"

15

"preferred" forum because it claims past success there with similar cases.  <u>Glaceau's Motion to Dismiss</u>, page 12.  This is, by definition, forum shopping.

In contrast, NBC filed its declaratory judgment action in the Southern District of Florida, its home forum and the forum which encompassed the locus of operative facts.  Accordingly, it is NBC's choice of forum, not Glaceau's, which is entitled to deference: this factor weighs in favor of the Southern District of Florida.

### v.  <u>The Florida Forum Is Familiar with the Governing Law.</u>

The Florida Court is "perfectly familiar with the intellectual property matters presented in this action.  Therefore, this factor does not weigh in favor of either forum." *AbovePeer, Inc.*, 166 F. Supp. 2d at 660 (finding neither forum favored despite the fact that one encounters more copyright actions than the other).

The Florida federal district court may properly adjudicate the New York state law claims which are part of this action.  In *800-Flowers*, the plaintiff alleged violations of both federal and New York statutory and common law: in finding that the balance of convenience favored Florida, the Court stated: "The pending action in Florida will provide the plaintiff in the instant action every opportunity to protect and vindicate the rights it sought adjudicated in the instant action." *800-Flowers, Inc.*, 860 F. Supp. at 136.  Here, too, the Florida Court is prepared and able to apply New York law and adjudicate the New York claims, in addition to the federal claims.  Thus, this factor does not weigh against the Florida forum.

---

on the Civil Cover Sheet accompanying its Complaint; however, the clerk, in accordance with Southern District of Florida Local Rules, randomly assigned the case to a Miami-based judge. Second, there is no legal difference between two *divisions* of a single district.  In contrast, there is a substantial legal difference between two *districts*: the Eastern and Southern District of New York are not bound by one another's decisions, and consequently must follow different bodies of law.

16

**LOTT & FRIEDLAND, P.A.** • 355 Alhambra Circle • Suite 1100 • Coral Gables, Florida 33134
(305) 448-7089 • (305) 446-6191 telecopier

### vi.  **The Florida Forum Better Serves the Interests of Justice.**

In deciding whether a balance of convenience favors one forum over another, a Court must examine the totality of the circumstances.  By filing in this Court, Glaceau has engaged in forum shopping, which practice is actively discouraged by the Courts.  The Court should also consider the importance of the public's interest in being able to adjudicate one's rights under the Declaratory Judgment Statute, 28 U.S.C. § 2201-02, which provides that any party may seek a declaration of its rights "[i]n a case of actual controversy."  This Court has recognized the recent Supreme Court decision which effectively lowered the threshold for a plaintiff to bring a declaratory judgment action and requires only that:

> the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Frederick Goldman, Inc. v. Trent West, et al.*, 2007 U.S. Dist. LEXIS 50259 at *8 (S.D.N.Y.), quoting *MedImmune, Inc. v. Genentech, Inc., et al.*, 127 S. Ct. 764, 771 (2007).  The purpose of the Declaratory Judgment Act "is to enable those threatened [with allegations of infringement] to remove such a cloud on their commercial activity, instead of being obliged to await the convenience of the threatening party." *Neil Bros., Ltd. v. World Wide Lines, Inc.*, 396 F. Supp. 2d 340, 346 (E.D.N.Y. 2005) (internal citation omitted). The public has an important interest in preserving the ability to have one's rights adjudicated in its chosen forum without having to "wait and see" if the party threatening its rights will proceed to litigate them.  Both the public interest and Glaceau's forum shopping militate in favor of the Florida forum.

In sum, seven of the nine convenience factors weigh in favor of the Florida forum and against this Court, and the remaining two factors are neutral.  Taking all of the above factors into account, especially that the locus of operative facts is in Florida (including NBC's conduct,

**LOTT & FRIEDLAND, P.A.** • 355 Alhambra Circle • Suite 1100 • Coral Gables, Florida 33134
(305) 448-7089 • (305) 446-6191 telecopier

which *Glaceau* has put at issue), the balance of convenience does <u>not</u> justify a departure from the

first-filed rule. See *Schnabel*, 322 F. Supp. 2d at 520; *800-Flowers, Inc.*, 860 F. Supp. at 136;

and *J. Lyons & Co. Ltd.*, 892 F. Supp. at 493.

### c. No Special Circumstances Exist Which Justify a Departure from the First-Filed Rule.

Special circumstances which justify a departure from the first-filed rule include: 1) where

the first-filed suit is an improper anticipatory declaratory judgment action; and 2) "'where forum

shopping alone motivated the choice of the situs for the first suit.'" *Employers Insurance of

Wausau et al.*, 522 F.3d at 275-276. Glaceau has also argued that the Florida Action was a

secretive "hip-pocket filing" which requires departure from the first-filed rule. <u>Glaceau's Reply</u>,

page 5 n. 1. As none of these circumstances exists, this Court should uphold the first-filed rule.

### i. The Florida Action Is Not An Anticipatory Filing.

Merely being the first-filed action does not render an action "anticipatory." However, a

court will generally find an action to be anticipatory if it was filed in response to a direct threat

of litigation that gives specific warnings as to deadlines and subsequent legal actions. *Employers

Insurance of Wausau et al.*, 522 F.3d at 275-276. The *J. Lyons* case sets forth the definitive

factors:

> When a notice letter informs a defendant of the intention to file suit, a filing date,
> and/or a specific forum for the filing of the suit, the courts have found, in the
> exercise of discretion, in favor of the second-filed action.

*J. Lyons & Company Ltd.*, 892 F. Supp. at 491. In the *J. Lyons* case, the plaintiff sent cease and

desist letters to three defendants stating that it would "'be constrained to pursue appropriate legal

steps against'" the defendants if they did not comply, and that its attorneys were authorized to

consider taking legal action against the defendants.  The defendants subsequently filed

declaratory judgment actions.  The Court found that the language of the letters did <u>not</u> constitute

18

any of the three elements for a notice of suit letter, namely a specific intention to file suit, a filing date, or a specific forum. Accordingly, the Court found that the defendants' declaratory judgment actions were not anticipatory filings and did not require departure from the first-filed rule. *Id.*

In *Employers Insurance of Wausau v. The Prudential Insurance Co.*, Prudential sent two letters to Wausau. The first stated that Prudential was "'prepared and fully intend[ed] to pursue all available remedies to [it] to obtain coverage under the policies.'" The second stated that Prudential hoped to avoid litigation and believed Wausau's denial of coverage was not in good faith and exposed Wausau to liability. Wausau subsequently filed a declaratory judgment action. The Court found that neither letter contained any of the elements of a notice of suit letter. In fact, Prudential's second letter "was at best an attempt to initiate settlement negotiations." Thus, the declaratory judgment action was not anticipatory. *Employers Insurance of Wausau v. The Prudential Insurance Company of America et al.*, 763 F. Supp. 46, 49 (S.D.N.Y. 1991). *See also Schnabel, 322* F. Supp. at 513 (declaratory judgment action filed in response to letters suggesting settlement negotiations was not anticipatory).

Like the letters in *J. Lyons, Employers Insurance* and *Schnabel*, Glaceau's May 19 letter does not include any of the elements necessary for a notice of suit letter. Although the letter makes reference to "judicial intervention", this reference does not evidence Glaceau's *intention* to file suit. In fact, the letter follows this reference with the phrase *"[i]f* Glaceau is forced to pursue that route" (emphasis added): this language makes it clear that Glaceau had not decided to file suit. The language "[Glaceau] expressly reserves its right" also supports this interpretation: there is no need to reserve *future* rights if one has already decided to seek judicial intervention.

19

Rather than a notice of suit letter, the May 19 letter was an attempt to initiate negotiations. Like most cease and desist letters, the May 19 letter states its hope that "this dispute amicably can be resolved," and that Glaceau is "prepared to discuss an appropriate transition period for the changes [to NBC's trade dress]." The letter seeks a response by May 28, 2008. These features of the letter evidence its purpose as a negotiation tool rather than a notice of suit letter. By suggesting twice that negotiation is possible, and by then seeking a response to this offer, Glaceau's letter makes it clear that it is open to discussion of the matter. Glaceau itself supports this interpretation of the letter as an invitation to negotiation. Glaceau's Motion to Dismiss, page 3; Bikoff Declaration ¶ 8.

Glaceau's Motion to Dismiss makes clear that its filing of this action was in retaliation against NBC for filing the Florida Action: "[i]n light of what Glaceau perceived to be NBC's bad faith and gamesmanship, and because NBC did not provide any substantive [response] by the May 28, 2008 deadline, Glaceau proceeded with the filing [of this action]." Glaceau's Motion to Dismiss, page 4. Glaceau's admission is clear evidence that it did not intend to file suit when it sent the May 19 letter: its suit was a reaction to the Florida Action. As further evidence that Glaceau was not planning to file, its complaint was amended three business days after filing. This evidences a last minute rush to get papers on file – meaning a complaint was not waiting at the ready - and attempt to secure its preferred forum.[30]

---

[30] Glaceau has painted NBC's Florida filing as a "mad rush to the courthouse." Glaceau's Reply, p. 4. However, "there can be no race to the courthouse when only one party is running." *Learning Networks, Inc. v. Discovery Communications, Inc.*, 11 Fed. Appx. 297, 301 (4th Cir. 2001).

20

NBC is not required to stand by complacently and wait to see whether its far larger competitor might choose to take action.[31]  This is the exact situation that the Declaratory Judgment Act was designed to address; the need for a prompt declaration of rights in the midst of an "actual controversy." 28 U.S.C. § 2201.

As noted above, the recent *MedImmune* case requires consideration of *all* of the circumstances in determining whether a declaratory judgment is appropriate. NBC took all the necessary analytical steps before it filed.[32]  The surrounding circumstances, taken together, created a "substantial controversy...of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 127 S.Ct. at 771.[33] Construing *MedImmune* case, the Federal Circuit has found that declaratory judgment jurisdiction "may be met where the [declaratory judgment defendant]...puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *SanDisk Corporation v. STMicroElectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).[34]

Under the circumstances, the Florida Action is not an anticipatory filing, but rather an appropriate and soundly-based declaratory judgment action.  The Court should adhere to the first-filed rule and dismiss, stay or transfer this action in favor of the Southern District of Florida.

---

[31]  In the Florida Complaint, NBC states that Glaceau's allegations of infringement created "a reasonable apprehension by [NBC] that [Glaceau] will file a lawsuit."  This reasonable apprehension of a possible suit *at some point in the future* is a far cry from the anticipatory filings in which the declaratory judgment plaintiffs were *placed on notice* that the declaratory judgment defendants intended to bring suit.

[32]  *See supra* at 7-8 and Hilden Declaration ¶¶ 34-43.

[33]  *MedImmune* overruled the Federal Circuit's "reasonable apprehension of suit" test in favor of an "all circumstances" test.

[34]  Both *MedImmune* and *SanDisk* involved patent infringement.  The Tenth Circuit has applied *MedImmune* to trademark infringement.  *Surefoot LC v. Sure Foot Corporation*, 2008 U.S. App. LEXIS 14327 at *17-18 (10th Cir.).

ii. **NBC Did Not Engage in Forum Shopping.**

Another special circumstance requiring departure from the first-filed rule occurs where forum shopping *alone* motivated the first-filed action. However, "merely filing a declaratory judgment action does not indicate forum shopping." *J. Lyons & Co., Ltd.*, 892 F. Supp. at 491 (finding that defendants appropriately filed declaratory judgment actions in the forum most convenient to them). Further:

> This does not mean that any evidence of forum shopping will suffice…Rather, the first-filing plaintiff must engage in some manipulative or deceptive behavior, or the ties between the litigation and the first forum must be so tenuous or *de minimis* that a full "balance of convenience" analysis would not be necessary to determine that the second forum is more appropriate than the first.

*Employers Insurance of Wausau*, 522 F. 3d at 276. The Court in *Schnabel* applied this test and determined that Schnabel did not engage in forum shopping by filing a declaratory judgment action in the Southern District of New York:

> Schnabel resides in New York, developed [the] computer program [at issue in the case] in New York, and met with Ramsey in New York to discuss his employment contract. Schnabel's choice of forum does not suggest forum shopping.

*Schnabel*, 322 F. Supp. at 513-14. This case is similar. NBC resides in the Southern District of Florida, where it has its principal place of business. Most of the events giving rise to the action arose in Florida, since decisions regarding manufacturing of the product are made in or directed from Florida, and since eight (8) times the amount of product sold in New York was sold in Florida. NBC has not engaged in any manipulative or deceptive behavior, and the ties between the Florida Action and the Southern District of Florida are not tenuous. There is no indication that the Southern District of Florida is particularly favorable for defendants in trademark and trade dress cases. This is unlike the situation in New York where Glaceau has admitted it

22

"prefers" this forum <u>because</u> of favorable past decisions.  Accordingly, this factor favors the Florida forum rather than this forum.

### iii.  <u>The Florida Action Is Not a "Hip-Pocket" Filing.</u>

In its Reply, Glaceau cites to non-precedential cases to establish the concept of a "hip pocket" filing as another special circumstance requiring departure from the first filed rule. <u>Glaceau's Reply</u>, page 5 FN 1.  The term applies in an action which was "filed early such that it 'may be pulled out in case a dispute subsequently results in litigation.'"  *Remington Arms Company, Inc. et al. v. Federal Cartridge Company*, 2004 U.S. Dist. LEXIS 3848 at *8 (M.D.N.C.) (internal citation omitted) (no "hip pocket" exception where service of process was effected four (4) business days after filing).  In fact, two (2) business days after filing, NBC's counsel telephoned Glaceau's counsel intending to request him to accept service of the Florida Complaint.  Three (3) business days after filing, the Florida Complaint was served on Glaceau's registered agent in Florida.

Unlike the declaratory judgment plaintiff in the *Xoxide* case, NBC was not attempting to "lull Glaceau into inaction" by engaging in settlement discussions while secretly filing behind Glaceau's back.[35]  In the instant case, there had been no settlement discussions whatsoever, only a letter from Glaceau and an acknowledgement from NBC, which exchange spanned two days. NBC's response simply promised to investigate the claims and respond shortly.  It did not

---

[35] <u>Glaceau's Motion to Dismiss</u>, page 7; *Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1193-94 (C.D. Cal. 2006) (finding declaratory judgment action anticipatory where plaintiff filed suit in the midst of protracted settlement discussions with defendant over a period of three months, requested additional time to respond, did not serve the suit while it continued to pretend to engage in good faith negotiations, and subsequently admitted that the declaratory judgment action was "'insurance in case Ford decided to sue [Xoxide] in Michigan...a forum of its choosing.'")

23

promise to engage in settlement discussions, nor request additional time to respond. If Glaceau was "lulled into inaction" by such language, it was self-induced.

NBC had no intention or expectation that its filing be secret. Federal filings are publicly available almost instantly through PACER. NBC served within three business days.[36]  This evidences the opposite of an intent to hide the filing from Glaceau or an effort to preserve it for the future should it become necessary.  There was no "hip-pocket" filing which would favor this forum over Florida.  In sum, because the balance of convenience favors Florida, and because no special circumstances exist which require departure from the rule, this Court should adhere to the well-settled first-filed rule and dismiss, stay or transfer this action to the Southern District of Florida.

### d.  **Transfer of Venue Is Proper.**

Courts in this District engage in a two-part test to determine whether transfer is warranted under 28 U.S.C. § 1404(a).  Under the statute, a district court may transfer any civil action to any other federal district court where it might have been brought "'[f]or the convenience of parties and witnesses, in the interest of justice.'" *McCain*, 2007 U.S. Dist. LEXIS at *10.  Thus, the first part of the test is whether venue is proper in the district to which transfer is sought.

The Southern District of Florida has personal jurisdiction over Glaceau because Glaceau does business in the State of Florida and uses its allegedly infringed upon trademark and trade dress in the State of Florida.  Glaceau and its parent, Coca-Cola, are registered to do business in Florida and have registered agents in Plantation, Florida.  Their extensive distribution network has contacts in Florida.  Under 28 U.S.C. §1391, venue is proper in the Southern District of Florida in that Glaceau is an entity subject to jurisdiction in that judicial district.

---

[36] Fed. R. Civ. P. 4(m) allows 120 days for service.

24

The second part of the test is whether the balance of convenience factors weigh in favor of transfer to the proposed forum. *McCain*, 2007 U.S. Dist. LEXIS at \*10. As discussed in Section (b) above, the balance of convenience weighs in favor of the Florida forum. Accordingly, venue in the Southern District of Florida is proper, and this Court may transfer this action to that district.

## IV.    CONCLUSION

It is in the interests of judicial economy and consistency that only one of these "mirror" actions be permitted to proceed. Under the first-filed rule, that action should be the Florida Action. NBC's filing was exactly the type of action contemplated by the Declaratory Judgment Act and permitted by *MedImmune*. It was brought in the appropriate forum on the basis of NBC's good faith need for a prompt declaration of its rights in the face of an actual controversy raised by Glaceau. The balance of convenience weighs in favor of Florida, which further supports adherence to the first-filed rule.

WHEREFORE, NBC respectfully requests this Court to dismiss this action or, in the alternative, stay this action pending resolution of the Florida Action or transfer this action to the Southern District of Florida.

Dated: Miami, Florida            Respectfully submitted,
        August 7, 2008

                                 **LOTT & FRIEDLAND, P.A.**

                                 By: s/ Leslie J. Lott
                                     Leslie J. Lott
                                     New York Bar No. 1633130
                                     355 Alhambra Circle, Suite 1100
                                     Coral Gables, Florida 33114
                                     Tel: (305) 448-7089
                                     Fax: (305) 446-6191
                                     Email: ljlott@lfiplaw.com
                                     *Attorneys for Defendant,*
                                     *National Beverage Corp.*

                                     25

## CERTIFICATE OF SERVICE

I hereby certify that on the referenced date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the following Service List in the Manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Leslie J. Lott
Leslie J. Lott

David H. Bernstein
Debevoise & Plimpton LLP
919 Third Avenue, 31st Floor
New York, New York 10022

*Attorneys for Plaintiff Energy Brands, Inc. d/b/a Glaceau*

*Service via CM/ECF*

# Exhibit A



THE VOICE OF BEVERAGE RETAILING

# BEVERAGE SPECTRUM

NOVEMBER – DECEMBER 2007

# FLAVOR & FUNCTION

## FIGHT THE BOTTLED WATER BLUES



**ALSO THIS ISSUE:**

**NACS IN REVIEW**

**42 NEW PRODUCTS!**

PUBLISHED BY


sweeteners or preservatives. Delivering the purity of water with patent-pending natural flavor blends, PURE COOL is available in two still varieties, Triple Chill and Tropical Tiki, in 16 oz. PET bottles and two sparkling varieties, Mojo Cool and Pear Ginger-Ice, in 12 oz. glass bottles.

Jones Soda – Jones Soda Company is now producing 24c. These vitamin-enhanced waters are high in Vitamin C and balanced to provide a full day's worth of essential vitamins and electrolytes. 24c is sold in 20 oz. bottles in six flavors: Lemon Lime, Mandarin Orange, Tropical Citrus, Peach Mango, Berry Pomegranate, and Cranberry Apple. 24c is sweetened with pure cane sugar and is free of high-fructose corn syrup. With significantly more vitamins than any other enhanced water currently on the market, 24c is also available as an effervescent drink mix, giving consumers a choice that no other vitamin-enhanced water on the market offers. In addition, for every bottle of 24c sold, the company donates $0.25 to Vitamin Angels, a non-profit organization with a mission to prevent vitamin deficiency-caused blindness by distributing

vitamin A to at-risk children throughout the world.

National Beverage Co. – National Beverage Corp has unveiled **Asanté**, a line of nutritionally Enhanced Flavored Waters. Meaning "To Health" in Italian, Asanté is a new enhanced water and sports drink with a refreshing fruit flavored taste designed to promote health in 5 functional areas: Replenish, Mental Clarity, Stamina, Immune and Energy. The mix of vitamins, minerals and bioactive compounds is blended with natural fruit flavor and sweetened with Crystalline Fructose for maximum flavor and a reduced caloric content. Each flavor has only 50 calories per 8 oz. serving. Asanté's all natural flavors are preservative free and available in a resealable 20 oz. PET bottle.

Acquaclear – **Acquaclear** is proud to have successfully introduced a line of flavored natural fruit drinks to Philadelphia and its surrounding communities. Acquaclear's flavored waters come in five natural fruit flavors: cherry, strawberry-watermelon, tropical fruit, peach and or-







ange-mango. The company has devoted considerable time and effort in bringing Acquaclear to the Philadelphia market.

Kid Fuel – **Kid Fuel** is a vitamin-enhanced water beverage created specifically for children aged 3-12. The Las Vegas-based company continues to ink new deals daily and is excited to announce that Kid Fuel is now available in 4-bottle and 12-bottle packages. 12-bottle packages are designed for the specialty retailers, small warehouse stores and club warehouse retailers. The 12-bottle packs feature an innovative box that displays a bottle on each side. Kid Fuel's 4-pack is designed to fit perfectly into the supermarket channel. Both multi-packs are constructed with easy-to-grab design features. Kid Fuel is available at select retailers in the Las Vegas market and will be expanding into the western region at major retailers in 2008.



VitaZest – **VitaZest's** national distribution is expanding rapidly by riding the wave of increasing health awareness that is changing the landscape of the beverage industry. In addition to 10 vitamins and minerals VitaZest contains no carbohydrates, calories, sugar, sodium, artificial colors, or preservatives. Vitamin Enriched Green Tea, a line extension, was introduced in spring 2007 and added to the lineup, which includes Pomegranate, Kiwi Strawberry, Blueberry, Pineapple Mango and Passion Fruit. In 2008, VitaZest will continue its successful partnership with the Diabetes Research Institue Foundation (DRIF), whose logo is placed on every bottle, and whose mission is to fund diabetes research at the University of Miami. A portion of all VitaZest sales is contributed to the DRIF.



Najaro – Najaro's **FlavH20** is coming out with some exciting new flavors, Grape, Raspberry, and Kiwi-Watermelon in 2008, as well as a lline of Sugarless FlavH2O drinks without any sugar or artificial sweeteners.In addition to product expansion, "Flav" is in negotiations with a NASCAR Team to be their primary sponsor.



BYB Brands – BYB Brands' **Respect** offers consumers all-natural hydration with a consistent base of essential vitamins and minerals. Four new flavors of Respect, including Passionfruit and Tangerine Orange, will be hitting the market in the first quarter of 2008, in all-new packaging.



Vital Lifestyle Water – Vital Lifestyle Water has introduced four all-natural, vitamin-fortified, and lightly-flavored waters, Burn (acai-flavored), Calm (guava), Vitality (citrus-starfruit) and Energize (dragonfruit). In addition to the benefits of added vitamins B and C, each 8 oz. serving contains just 15 calories and a high recommended daily intake of B vitamins. This product is sweetened using all-natural fruit sugars using a technology that enables it to retain its low calorie count. Vital Lifestyle Water is available nationally in Canada in numerous retailers such as 7-Eleven, Chevron, and Whole Foods. In the United States Vital Lifestyle Water can be found in numerous retailers throughout Florida, California, New York, New Jersey, Pennsylvania and Virginia.




Glaceau – Glaceau's two newest Vitaminwater varieties are Vitaminwater xxx and Vitaminwater b-relaxed. XXX blends the taste of açai, blueberry, and pomegranate, bringing the antioxidant levels to this brand new variety off the charts. B-relaxed helps the body to deal with stress by replacing b vitamins and contains theanine, an amino acid found in tea leaves, which is a derivative of glutamine, to promote relaxation. B-relaxed features an innovative jackfruit-guava flavor. Jackfruit, native to Southeast Asia, is the largest tree-borne fruit in the world, with a flavor similar to pineapple.



Borba – **Borba**, in partnership with Anheuser-Busch, has completely re-crafted its entire line of Skin Balance Water and Aqua-less Crystalline. Backed by significantly more marketing dollars, this relaunch initiative is intended to catapult Borba to greater consumer awareness, trial and retention. BORBA is presently sold in select upscale retailers such as Sephora, Macy's and Equinox Fitness Centers.



Wild Waters – **Wild Waters**, a vitamin-enhanced water made for kids, expanded its distribution and products in 2007. Wild Waters reformulated and repackaged its 10 oz. bottled water line to deliver six all natural flavors, including two new SKUs. Freestyle Wild Berry and Lemon Wave were added this summer, joining Flippin' Fruit, Kickin' Green Apple, Groovin' Grape and Twistin' Tropical. The brand is now sold in major c-stores, grocery chains and schools throughout the Northeast. Wild Waters is proud to sponsor the "Read to Ride" program that re-






# Exhibit B



# Exhibit C

David H. Bernstein (DB 9564)
Jyotin Hamid (JH 4651)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Plaintiff Energy Brands Inc.*

ELECTRONICALLY FILED



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ENERGY BRANDS INC. d/b/a GLACÉAU,      :

                     Plaintiff,      :

           v.      :

PEPSICO, INC. and SOUTH BEACH      :
BEVERAGE COMPANY, INC.,      :

               Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 Civ. _____

**06 CV 2662**

### COMPLAINT AND DEMAND FOR JURY TRIAL

      Energy Brands Inc. d/b/a Glacéau ("Glacéau"), by its attorneys, Debevoise

& Plimpton LLP, for its complaint, alleges as follows:

### NATURE OF THE ACTION AND RELIEF SOUGHT

      1.     This is an action for trade dress infringement, trade dress dilution

and unfair competition arising out of the recent nationwide launch of a new nutrient-

enhanced water product, LIFEWATER, by PepsiCo, Inc. ("PepsiCo") and its subsidiary

South Beach Beverage Company, Inc. ("SoBe") (together, "Defendants").

      2.     Within the last several weeks, Defendants have embarked on an

unlawful campaign to lure consumers and retailers into purchasing LIFEWATER in the

mistaken belief that it is the same brand as, or is sponsored by or affiliated with, the

Cent, *American Idol* star Kelly Clarkson and NASCAR racing star Kasey Kahne (see above).

24.    VITAMINWATER products are often sold using point of sale devices, such as individualized display cases or coolers. All display cases are clear, which further highlights the VITAMINWATER trade dress and the colored nature of the water inside. All of the point of sale materials include elements designed to be evocative of the VITAMINWATER trade dress, including the brightly colored liquid-filled bottles, against a white background. Some point of sale materials also feature a color band against a white background, mimicking the VITAMINWATER label.

25.    In addition to point of sale materials, Glacéau has a substantial print advertising campaign which prominently features the VITAMINWATER trade dress. The VITAMINWATER trade dress also appears on Glacéau's Fleet Graphics delivery trucks, approximately 300 of which are on the road each day.

26.    In 2005 alone, Glacéau spent nearly $36 million in advertising and promoting the VITAMINWATER brand. Glacéau will spend over $50 million in 2006, the majority of which will be spent for the Summer campaign over the next several months.

## SALES OF VITAMINWATER

27.    Glacéau contracts with various "co-packers" to manufacture and bottle VITAMINWATER to Glacéau's specifications. Glacéau then sells VITAMINWATER to distributors for various territories throughout the United States, who in turn sell it to retailers, including supermarkets, neighborhood stores, health clubs and gyms. While Glacéau has achieved nearly nationwide distribution, it does not have

11

its own distribution network.  Rather, it relies on hundreds of independent distributors in different areas of the country.  Even though VITAMINWATER beverages are now available in all 50 states, it has taken seven years for Glacéau to achieve distribution to less than 40% of retail channel availability.

28.     VITAMINWATER beverages have enjoyed exponential sales growth since their introduction in 1999.  In 2005 alone, Glacéau's retail revenues from VITAMINWATER beverages exceeded $150 million, representing the sale of more than 225 million bottles.  In 2006, Glacéau expects revenues of more than $275 million from sales of more than 400 million bottles, roughly half of which will be sold during the hot summer months.

## DEFENDANTS' BAD FAITH

29.     Defendants' bad faith in developing the LIFEWATER trade dress is evident both from the history of dealings between the parties and an examination of the trade dress used on Defendants' and third parties' other beverage products.

30.     As noted above, PepsiCo's first entry in the nutrient-enhanced water category – AQUAFINA ESSENTIALS – failed.  The trade dress of AQUAFINA ESSENTIALS, like that of PROPEL, PepsiCo's current entrant in the category, demonstrates that Defendants know how to design non-infringing trade dress when they want to do so.  Defendants designed non-infringing trade dress for both of these products.  Neither of these products used the bell-shaped bottle used for VITAMINWATER products, neither had colored water,



12

# Exhibit D

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-60792-CIV-ALTONAGA/BROWN

NATIONAL BEVERAGE CORP.,
a Delaware corporation,

       Plaintiff,

v.

ENERGY BRANDS INC. d/b/a GLACÉAU,
a New York corporation,

       Defendant.

---

### DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY OR TRANSFER, WITH INCORPORATED MEMORANDUM OF LAW

Upon receipt of a demand letter from Defendant Energy Brands Inc. d/b/a Glacéau ("Glacéau") challenging the trade dress of ÀSANTÉ beverages, Plaintiff National Beverage Corp. ("National Beverage") sent a letter promising to provide a "full response . . . shortly." Instead, just three days later, on May 23, 2008, Plaintiff secretly rushed to file an anticipatory declaratory judgment complaint in this Court in a transparent effort at forum shopping. That effort must fail. Plaintiff's unseemly rush to the courthouse undermines the policy of encouraging parties to discuss settlement before seeking recourse in the courts and is contrary to the many precedents refusing to reward an anticipatory complaint filed in such circumstances.

Accordingly, Glacéau, by and through undersigned counsel and pursuant to the applicable case law, respectfully requests that Plaintiff's complaint be dismissed to allow the lawsuit that Glacéau filed on May 28, 2008 in the United States District Court for the Southern District of New York[1] to proceed. In the alternative, Glacéau requests that this Court stay this

---

[1] *Energy Brands Inc. d/b/a Glacéau v. National Beverage Corp.*, 08 Civ. 4909 (JSR).

matter pending resolution of the New York action or transfer this case to New York. In further

support of the instant Motion to Dismiss, Glacéau submits the following memorandum of law.

## BACKGROUND AND PROCEDURAL POSTURE

### A.    GLACÉAU AND THE VITAMINWATER® BRAND

In 1999, Glacéau, a New York-based company, pioneered the enhanced water category

when it launched the VITAMINWATER® brand, a line of natural, colored, flavored, high

quality, ultra-pure bottled waters enhanced with vitamins, minerals and other nutrients. In the

nine years since, the brand has achieved critical renown. Notwithstanding the addition of

numerous competitors in this category, the VITAMINWATER® brand remains the recognized

leader in the enhanced water category. This year, Glacéau expects VITAMINWATER® sales to

exceed $1 billion in the United States alone. Declaration of J. Darius Bikoff ("Bikoff Decl.")

¶¶ 3-4.

Glacéau's VITAMINWATER® trademark and label design are registered with the United

States Patent and Trademark Office ("USPTO"). *See* Trademark Registration Nos. 2,974,987

and 2,975,087 (attached to the Bikoff Declaration as Exhibit. A). In addition to the quality of the

product itself, the phenomenal success of the VITAMINWATER® brand has been based largely

on its distinctive trademarked-name and its unique package and label design, known as "trade

dress." The trade dress of VITAMINWATER® is one of the most important ways in which

consumers identify the brand on the shelf or in the hands of celebrities and other consumers, and

it thus is among Glacéau's most valuable intellectual property rights. Bikoff Decl. ¶ 6.

### B.    NATIONAL BEVERAGE AND THE ÀSANTÉ BRAND

National Beverage, which markets various beverage products, including water products,

has embarked on an unlawful campaign to lure consumers into purchasing its own nutrient-

enhanced water product, ÀSANTÉ, in the mistaken belief that it comes from, is sponsored or

2

licensed by, or is associated or affiliated with, the VITAMINWATER® brand. National

Beverage's coordinated campaign of deception includes the wholesale copying of Glacéau's

famous and distinctive VITAMINWATER® trademark (as shown at right, National Beverage

uses the phrase "NUTRIONALLY ENHANCED FLAVORED

VITAMIN WATER" on its product's label), National Beverage's



dilution of the VITAMINWATER® trademark through its treating

that federally-registered trademark as a generic term, and its

improper design of the packaging for ÀSANTÉ water, which appears intentionally to mimic

several key elements of the well-known and distinctive VITAMINWATER® trade dress. *Id.* ¶ 7.

### C.    GLACÉAU'S CORRESPONDENCE WITH NATIONAL BEVERAGE AND THE FLORIDA ACTION

Upon learning of National Beverage's trade dress infringement, Glacéau, through its

counsel, sent a letter, dated May 19, 2008, to National Beverage in order to determine whether an

amicable resolution of this dispute could be found. In its letter, Glacéau specifically warned that,

if National Beverage was not prepared to make changes to its trade dress, "Glacéau expressly

reserves its right to seek judicial intervention" whereby it could "not only seek an injunction

against any use of the infringing trade dress, but also could seek a recall of all products already

in the marketplace and damages for [National Beverage's] past sales." Glacéau's letter requested

that a written response be provided no later than May 28, 2008, and warned that, if Glacéau did

not hear from National Beverage or its counsel by that date, it would take appropriate action after

May 28, 2008. *Id.* ¶ 8 & Ex. B.

National Beverage responded quickly, with a letter dated May 20, 2008, in which it

promised that it would "look[] in to [Glacéau's] objection to the trade dress of the Ásanté brand"

and would "provide a full response to [Glacéau's] letter shortly." Based on this response,

Glacéau expected to hear further from National Beverage so that the parties could enter into a dialogue about resolving the dispute. *Id.* ¶ 9 & Ex. C (Letter from Vickie L. Hilden to David H. Bernstein, dated May 20, 2008).

No such "full response" was ever sent. Instead, just three days later, National Beverage rushed its anticipatory declaratory judgment complaint on file with this Court (the "Florida Complaint," initiating the "Florida Action"). *Id.* ¶¶ 10-11. Glacéau first learned about the Florida Complaint not from National Beverage or its counsel, but rather when the filing of the declaratory judgment complaint was publicly reported on May 27, 2008. *Id.* ¶ 10, Ex. D. Glacéau first received formal notice on June 2, 2008, when it received copies of the complaint from CT Corporation, which apparently was served on May 29 and 30, 2008.[2] *Id.* ¶ 10, Ex. E.

To date, National Beverage has still not provided a written response to Glacéau's May 19 letter. *Id.* ¶ 11.

### D.   THE NEW YORK ACTION

In light of what Glacéau perceived to be National Beverage's bad faith and gamesmanship, and because National Beverage did not provide any substantive letter responding to Glacéau's concerns by the May 28, 2008 deadline, Glacéau proceeded with the filing of its Complaint in the United States District Court for the Southern District of New York (the "New York Action") on the afternoon of May 28, 2008 (prior to service of the Florida Complaint). On June 2, 2008, Glacéau filed an Amended Complaint. The Complaint and Amended Complaint have both been served on National Beverage; its answer in the New York Action is due on June 18, 2008. *Id.* ¶¶ 12-13. *See Energy Brands Inc. d/b/a Glacéau v. National Beverage Corp.*,

---

[2] For unknown reasons, Glacéau was apparently served with the Florida Complaint twice, first on May 29, 2008 and then again on May 30, 2008.

The very next day, National Beverage wrote to Glacéau's counsel, stating:

> Thank you for your letter dated May 19, 2008. We are looking in
> to your client's objection to the trade dress of the Ásanté brand and
> will provide a full response to your letter shortly.

Bikoff Decl. Ex. C. Not surprisingly, National Beverage did not include a copy of this letter

with its declaratory judgment complaint. As is now evident, the purpose of this letter was not to

pursue settlement, but rather to lull Glacéau into inaction so that National Beverage could forum-

shop by rushing to file its declaratory judgment complaint. Indeed, without providing any

further notice to Glacéau, National Beverage filed its complaint with this Court just three days

later, on May 23, 2008. To date, National Beverage has still not responded to Glacéau's May 19,

2008 letter.

As this chronology makes clear, National Beverage's declaratory judgment complaint

reflects nothing more than a forum-shopping effort to secure jurisdiction in its hometown venue[4]

and deprive the genuine plaintiff, Glacéau, of the right to seek adjudication of this dispute in its

preferred forum, the Southern District of New York, a court that is already familiar with

VITAMINWATER-related actions, in which venue is proper, and that has personal jurisdiction

over both parties. In circumstances such as these, federal courts in Florida have not hesitated to

rule that the second-filed complaint should proceed, rather than the anticipatory declaratory

judgment complaint. *E.g., Ven-Fuel, Inc.*, 673 F.2d 1194 (affirming dismissal of anticipatory

declaratory judgment complaint from then-Southern District of Florida Judge James Kehoe);

*Jasper Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 98-2532-CIV-T-17E, 1999 WL

781808, at *5 (M.D. Fla. Sept. 3, 1999) (transferring litigation to New York in light of the

---

[4] As noted in the Florida Complaint, National Beverage's principal place of business is One
North University Drive, Plantation, Florida 33324.

04 Civ. 1089 (GEL), 2004 WL 1824102, at *9 (S.D.N.Y. Aug. 13, 2004) ("the 'first effects' of trademark infringement or dilution are typically felt where the trademark owner resides and conducts business, and can include injury in the form of damage to goodwill, lost sales, or lost customers").

3.    The courts in the Southern District of New York have experience in considering claims involving the VITAMINWATER® trademark and trade dress. *See, e.g., Energy Brands Inc. v. Consac Indus., Inc.*, No. 02 Civ. 3594 (JGK) (S.D.N.Y. May 15, 2002) (entering TRO against trade dress that infringed the VITAMINWATER® trade dress); *Energy Brands Inc. v. Energy Multi-Vitamin Water Corp.*, 04 Civ. 4580 (RMB) (S.D.N.Y. Dec. 8, 2004) (settlement of claims regarding infringement of VITAMINWATER® trademark and trade dress); *Energy Brands Inc. v. Pepsico, Inc.*, No. 06 Civ. 2662 (SAS) (S.D.N.Y. May 2, 2006) (TRO hearing concerning infringement of the VITAMINWATER® trade dress); *Energy Brands Inc. d/b/a Glacéau v. Maw & Paw Specialty Pet Foods LLC*, 06 Civ. 3165 (VM) (S.D.N.Y. May 22, 2006) (permanent injunction against infringement of VITAMINWATER® trademark).    Indeed, Judge Rakoff, the District Judge to whom the New York Action has been assigned, has specific experience in addressing VITAMINWATER® trade dress issues. *Energy Brands Inc. v. Beverage Marketing USA, Inc.*, No. 02 Civ. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) (entering TRO against trade dress that infringed the VITAMINWATER® trade dress) (Rakoff, J.).

•    ***Washington appeared to be the more convenient venue*** in which to resolve the dispute. *St. Paul Fire and Marine*, 2006 U.S. Dist. LEXIS 66531, at *10; *see also Jasper Corp.*,

# Exhibit E

Int. Cl.: 32

Prior U.S. Cls.: 45, 46 and 48

## United States Patent and Trademark Office

**Reg. No. 2,975,087**
Registered July 26, 2005

## TRADEMARK
### PRINCIPAL REGISTER



ENERGY BRANDS INC. (NEW YORK COR-
PORATION)
17-20 WHITESTONE EXPRESSWAY
WHITESTONE, NY 11357

FOR: NON-ALCOHOLIC, FLAVORED DRINK-
ING WATER, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

FIRST USE 3-12-1999; IN COMMERCE 3-12-1999.

OWNER OF U.S. REG. NOS. 1,876,824, 2,658,236
AND OTHERS.

THE MARK CONSISTS OF A BOTTLE LABEL
WITH A BAND ACROSS THE TOP THIRD OF THE
LABEL, AND THE NAME GLACEAU VITAMIN-
WATER WRITTEN VERTICALLY THREE TIMES
ACROSS THE LABEL. THE WORD VITAMINWA-
TER IS WRITTEN IN LOWERCASE LETTERS AND
IN ALTERNATING EMPHASIZED AND REGULAR
FONT.

SEC. 2(F) IN PART, AS TO VITAMINWATER.

SER. NO. 76-445,170, FILED 8-29-2002.

CYNTHIA SLOAN, EXAMINING ATTORNEY

# Exhibit F



focus

kiwi-strawberry (as lutein)

like hers. so, how does she do it? behind
her hazel eyes is some serious focus. she's
living proof that with a little concentration
you can do anything ... catch a fly with
chopsticks, solve a sudoku puzzle, or climb
the corporate ladder, just stay off the top of
the charts — that's kelly's territory

vitamins + water = all you need

made for
the center for responsible hydration (aka glacéau)
whitestone, ny 11357
877-GLACEAU www.vitaminwater.com
label ® and © 2006

20 FL OZ • 591 mL

# Exhibit G

Jacksonville.com: Business Story: Winn-Dixie V-H20. Can it float more sales? Page 1 of 5

Case 3:08-cv-04909-JSR    Document 13-8    Filed 08/07/2008    Page 2 of 4



 Subscription Services   Currently 86°, P/SUNNY   TI

 Site  ○ Web _____   GO 

## BUSINESS


See how Ford is advancing technology    > Click to See Video

| HOME | NEWS | SPORTS | ENTERTAINMENT | COMMUNITY | PHOTOS | VIDEO | MOBILE | | CLASSIFIEDS | AUTOS | REAL ESTATE | JC |

| METRO | BUSINESS | FLORIDA | GEORGIA | NATION | WORLD | MULTIMEDIA | OPINION | COLUMNISTS | LEGISLATURE | OBITUARIES | WEATHER | ELECT |

| NEWS | INDICES / CURRENCIES | MARKET SUMMARY | MOVERS / GAINERS | CAREER TRACK | IN THE PIPELINE | COLUMNISTS | LEGAL NOTICES | GAS PRICE |

Home > Business > Story

✉ E-mail Story   🖶 Print Story   💬 Post Comment   ⭐ Most Popular

**BUSINESS**

Last modified 11/1/2007 - 7:09 am
Originally created 110107

# Winn-Dixie V-H20. Can it float more sales?

**By DIANA MIDDLETON, The Times-Union**

It's no surprise that vitamin-fueled drinks can literally buzz the body, but Winn-Dixie is counting on its new private label of "vitamin waters" to energize sales.

Winn-Dixie's new private label range of enhanced water, dubbed V-H2O, is a collection of four fruity flavors boasting a cornucopia of

## AQUA ENERGY

**Winn-Dixie V-H20:** The line includes four flavors, including fruit punch, kiwi strawberry, citrus and dragonfruit - a mix similar to its major competitors. Three of the four flavors include vitamin C, and all contain some form of vitamin B complex. Costs $1 per bottle and $20 for 20 bottles.

### HOW DO OTHERS COMPARE?

*We took a look at some of the more popular vitamin water*

**Top Jobs**
**THERAPY OPPORTUNITIES** Life Care Center of Hilliard PT/PT...
[ View all Top Jobs ]

**Top Homes**
**PONTE VEDRA BEACH** -
furni 2/2, saw grass cc, min. to bch, no pe...
[ View all Top Homes ]

**Top Autos**
**SELL YOUR BOAT** AT NO COST TO YOU? * WE CAN *



sponsored links

**business consulting**

Quick Setup & Easy To Use Entry Level Accounting.
See Here.
www.SimplyAccounting.com

**Start Your Business Coaching Practice**

Immediate downloadable and printable version of The
CoachStart Manual, used by 3,000 coaches in 90
countries. Limited time $1 trial. Guaranteed results.
www.10supercoaches.com

**Get on Track to Success**

Understanding is achieved through knowledge &
information-Watch video.
YouTube.com/churchofscientology

Ads by Yahoo!

vitamins and regenerative properties: energy, endurance and strength - just like the dozens of other popular vitamin-rich water brands on the market.

"This is part of the expansion of our private label program," said Robin Miller, a Winn-Dixie spokeswoman.

*brands.*

-- **Sobe Life Water:** Comes in five flavors including pomegranate cherry, strawberry kiwi and passion fruit citrus. The drink's sweetness comes from crystalline fructose, and all flavors contain vitamins C and E as well as B complex vitamins. Costs $1.67 per bottle.

-- **Glaceau Vitamin Water:** Comes in 15 flavors from dragonfruit to orange. Depending on the flavor, the drinks contain taurine (for energy), zinc (for defense against sickness) and electrolytes (for hydration) - not to mention a mishmash of vitamins. Costs $1.34 per bottle.

-- **Propel Fitness Water:** Clear beverage that comes in 13 flavors and includes four types of B vitamins. Four of those flavors also boast additional calcium. Costs roughly $3.99 for a pack of six.

-- **Zephrhills Zephyr Sport:** Clear beverage that comes in flavors like mixed berry. Also includes three different B complex vitamins. Costs $3.59 for six.

\* Prices were spot-checked by the Times-Union at local grocers.

Winn-Dixie isn't the only retailer aiming for growth in the segment. The trendy, multi-colored beverages - essentially fruit-flavored water containing an alphabet's soup worth of vitamins - are stimulating the beverage industry, with popular labels such as Glaceau's Vitamin Water and Sobe's Life Water seeing major sales growth and other beverage companies expanding their vitamin water offerings. Pepsi's Propel Fitness water (a division of Gatorade) is also getting into the action with a new crop of flavored waters, including lower-calorie versions, geared to help athletes off the field.

Overall, the beverage industry sold 231.7 million gallons of vitamin-enriched water last year, a rapid increase from the just 20.3 million sold in 2001, according to market research from Beverage Marketing Corp., a consulting company. The enhanced water category is growing because water makes a great platform for "healthy refreshment" marketing, said Gary Hemphill, senior vice president of the Beverage Marketing Corp.

"The category has grown rapidly from a relatively small base but much of the growth has come from the success of two brands - Propel and Vitamin Water," Hemphill said.

Salter Marine...
[ View all Top Autos ]

**Top Stuff**
**Riding Mower** w/ dumpcart,
Push mower, gas weed
wacker w/ edger/b...
[ View all Top Stuff ]

Despite the segment's positive buzz, Winn-Dixie will have to push for brand recognition in an already well-developed market. Glaceau's Vitamin Water and Smart Water accounted for 85.5 million gallons of product sold last year, a 33.3 percent increase from the previous year, according to the Beverage Marketing Council. Propel is the industry leader after selling 130.5 million gallons in 2006.

But Winn-Dixie could gain traction thanks to the tendency for private labels to have lower prices, said Jeff Cioletti, chief editor of Beverage World, an industry trade publication.

"The whole segment is just booming, but the bottom line is price," he said. "If someone wants to pay less, they'll pay for the store brand."

Winn-Dixie's new line is less expensive on a bottle-to-bottle basis with some competitors: At $1 per bottle (and $20 for 20 bottles), it beats Vitamin Water ($1.34 per bottle), Sobe Life Water ($1.67) and B12-loaded energy drink Red Bull (starts at $1.99).

Winn-Dixie may also benefit from the fact that it is the only private label vitamin water in Jacksonville. Publix, for example, has privately branded waters, but no vitamin or energy drinks, according to Publix spokesman Dwaine Stevens.

Winn-Dixie's debut flavors are similar to those that have already proved their popularity with other companies (such as Glaceau), including Vitality Fruity Punch ( a cocktail of vitamins C, B12 and B6) and Strength Dragonfruit, which contains taurine, zinc and vitamin B5.

Not that the similarity is a bad thing: According to editor Cioletti, there's enough consumer desire to drive the industry.

"Consumers are looking at beverages to do more for them - functionality is one of the key drivers of those types of beverages," Cioletti said. "Glaceau's Vitamin Water was a pioneer, and there have been a lot of similar products coming out on the heels of that."

diana.middleton@jacksonville.com,

(904) 359-4404

⊞ MORE STORIES

**Business Headlines**
» Port wants to fill empty containers with buying power from the Far East
» First Coast Ticker: Anheuser-Busch buyout talk raises concerns
» In the Pipeline
» Business Calendar

**Florida Headlines**
» Rock pioneer Bo Diddley dies at age 79
» U.S.: Army Corps plan wouldn't doom species
» Toddler killed when neighbor's van runs over her
» Body of missing boater found in Lake County

**Most Popular Stories**
» Jaguars sign WR Craphonso Thorpe
» Georgia governor suspends fuel tax increase
» Cab driver shot in Jacksonville Beach
» Morning traffic report: One wreck on the highway, traffic signals broken
» Morning weather report: Muggy and warm


NETFLIX


▶ Click here

REAL Cities
Click here to visit other
Real Cities sites

# Exhibit H

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-60792-CIV-ALTONAGA/BROWN

**NATIONAL BEVERAGE CORP.,**
a Delaware corporation,

<b>Plaintiff,</b>

Case 0:08-cv-60792-CMA     Document 6     Entered on FLSD Docket 06/04/2008     Pag

**v.**

**ENERGY BRANDS, INC. d/b/a GLACEAU,**
a New York corporation,

<b>Defendant.</b>

---

### DECLARATION OF J. DARIUS BIKOFF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY OR TRANSFER

I, J. Darius Bikoff, hereby declare as follows:

1.      I am the Founder and Chief Executive Officer of Defendant Energy Brands Inc. d/b/a Glacéau ("Glacéau"). I am familiar with the business and promotional activities of Glacéau, including with respect to our VITAMINWATER® nutrient enhanced water beverages.

2.      I submit this declaration, based on personal knowledge or my review of Glacéau's business records in support of Glacéau's motion to dismiss the Florida action or, alternatively, to stay the Florida action pending resolution of the New York action or transfer this action to the United States District Court for the Southern District of New York.

1

3.    In 1999, Glacéau, a New York-based company, pioneered the enhanced water category when it launched the VITAMINWATER® brand, a line of natural, colored, flavored, high quality, ultra-pure bottled waters enhanced with vitamins, minerals and other nutrients.

4.    In the nine years since, the brand has achieved critical renown. Notwithstanding the addition of numerous competitors in this category, the VITAMINWATER® brand remains the recognized leader in the enhanced water category.  In 2007, Glacéau enjoyed revenues of approximately $635 million based on its sale of VITAMINWATER® beverages in the United States, which translates into more than $1.4 billion in retail revenue.  This year, Glacéau expects its revenue from the sale of VITAMINWATER® beverages to exceed $1 billion in the United States alone.

Case 0:08-cv-60792-CMA    Document 6    Entered on FLSD Docket 06/04/2008    Pag

5.    Glacéau's VITAMINWATER® trademark and label design are registered with the United States Patent and Trademark Office.  Attached as Exhibit A are true and correct copies of the certificates of registration for the VITAMINWATER® trademark and label design.

6.    The phenomenal success of the VITAMINWATER® brand has been based largely on its distinctive trademarked-name and its unique package and label design, known as "trade dress."  As shown at right, the key elements of this distinctive trade dress include:  (i) use of the VITAMINWATER® trademark; (ii) a bell-shaped plastic bottle; (iii) a vertical presentation of the VITAMINWATER® name; (iv) a two-toned look, with one color in white and the other color generally matching the color of the water; (v) a clear cap; and (vi) an overall clinical, or health-



2

conscious, look. The trade dress of VITAMINWATER® is one of the most important ways in which consumers identify the brand on the shelf or in the hands of celebrities and other consumers, and it thus is among Glacéau's most valuable intellectual property rights.

7.    National Beverage Corp. ("National Beverage"), which markets various beverage products, including water products, recently launched a competitive nutrient-enhanced water product called ÀSANTÉ. Instead of packaging the product in its own distinctive trade dress and using its own distinctive trademarks, National Beverage's appears to have copied a number of key attributes of the VITAMINWATER® brand, including Glacéau's famous and distinctive VITAMINWATER® trademark (as shown at right, National Beverage uses the phrase "NUTRIONALLY ENHANCED FLAVORED VITAMIN WATER" on its product's label) and the trade dress for VITAMINWATER®. Specifically, the trade dress for ÀSANTÉ enhanced water beverages includes (i) the mark "VITAMIN WATER"; (ii) nearly identical bell-shaped plastic bottles, (iii) a similar vertical presentation of words (e.g., VITAMINWATER® versus CLARITY), (iv) a two-toned look, with one color in white and the other color generally matching the color of the water; (v) a clear cap; and (vi) an overall clinical, or health-conscious, look.

8.    Upon learning of National Beverage's trade dress infringement, Glacéau, through its counsel, sent a letter, dated May 19, 2008, to National Beverage in order to determine whether an amicable resolution of this dispute could be found. A true and correct copy of the May 19 letter is attached as Exhibit B. Glacéau expressly warned that, if National

3

22746955v2

Beverage did not agree to modify the ÀSANTÉ trade dress, Glacéau would seek judicial intervention, including injunctive relief. Glacéau further warned that, if it did not receive a substantive response by May 28, 2008, it would proceed accordingly.

9.    On May 20, 2008, Vickie L. Hilden of National Beverage sent a response to Glacéau's counsel, stating that she was looking into Glacéau's concerns and would "provide a full response . . . shortly.". A true and correct copy of the May 20 letter is attached as Exhibit C. Based on this response, Glacéau determined that it would not need to pursue an immediate lawsuit; instead, it expected to hear further from National Beverage so that the parties could enter into a dialogue about resolving this dispute without having to resort to litigation.

10.    Instead of receiving a "full response," on May 27, 2008, Glacéau received published reports that National Beverage had, apparently, filed a declaratory judgment complaint against Glacéau in Florida. *See* Exhibit D. Although Glacéau's counsel obtained a copy of the complaint that day through the Court's PACER system, Glacéau did not receive formal notice on the lawsuit until June 2, 2008, when it received copies of the complaint from CT Corporation, which apparently was served on May 29 and 30, 2008. *See* Exhibit E.

11.    To date, Glacéau has still not received a substantive written response to its May 19 letter.

12.    Upon reviewing the declaratory judgment complaint, Glacéau was surprised to learn that National Beverage was, apparently, using the "VITAMIN WATER" designation on its products' labels. Until that time, Glacéau had focused on the ÀSANTÉ trade dress, as depicted on the www.asantewater.com website, and had not noticed the illegible type on the website images where the label uses the phrase "VITAMIN WATER." In light of that new

4

and troubling fact, and given National Beverage's filing of its declaratory judgment complaint (which seemed to indicate that National Beverage had no intention of entering into good faith settlement negotiations) and National Beverage's failure to respond to Glacéau's letter by the May 28, 2008 deadline, Glacéau instructed its counsel to file its complaint in the United States District Court for the Southern District of New York. Attached as Exhibit F is a true

and correct copy of the Complaint filed by Glacéau. On June 2, 2008, Glacéau amended its complaint to add additional allegations, including claims for infringement and dilution of the VITAMINWATER® trademark. A true and correct copy of the Amended Complaint is attached as Exhibit G.

13.    I am informed by our counsel that the New York Complaint was served by hand on National Beverage on May 29, 2008, and that the Amended Complaint was served on National Beverage by hand on June 3, 2008.

14.    Attached as Exhibit H are true and correct printouts from National Beverage's website located at http://www.nationalbeverage.com/50Products.htm and http://www.nationalbeverage.com/20TodaysBusiness.htm that show that, in addition to ÀSANTÉ, National Beverage states that it has more than a dozen other beverage brands that are distributed nationally, including through national and regional grocery stores, warehouse clubs, mass-merchandisers, wholesalers, discount stores, convenience and gas stations, hospitals, schools, military bases, airlines, hotels, food-service wholesalers, and vending machines and coolers.

# Exhibit I

*The Coca-Cola Company*

# News Release

**THE COCA-COLA COMPANY TO ACQUIRE GLACÉAU, MAKER OF VITAMINWATER, FOR $4.1 BILLION**

**Gives Coca-Cola North America a Leading Brand in Fast-Growing Enhanced Water Category**

**Transaction to be Accretive to Coca-Cola Earnings Per Share in First Full Year**

**Glacéau to Operate as Separate Business Unit within Coca-Cola North America**

**ATLANTA and WHITESTONE, NY, May 25, 2007** - The Coca-Cola Company today announced that it has reached an agreement to acquire Energy Brands, Inc., known as glacéau, and its full range of fast-growing, enhanced water brands, including vitaminwater. The acquisition, for $4.1 billion in cash, provides The Coca-Cola Company with a strong platform to grow its active lifestyle beverages.

The transaction is expected to be accretive to The Coca-Cola Company's earnings per share in the first full year following completion of the acquisition. "We welcome vitaminwater, the icon of active lifestyles, to Coca-Cola, the ultimate and enduring icon of refreshment," said Neville Isdell, chairman and chief executive officer of The Coca-Cola Company. "Glacéau has built a great business with high-quality growth, as well as a strong pipeline of innovative products and brands. We envision even faster growth for glacéau as part of Coca-Cola's enhanced range of brands for North American customers and consumers. We will manage this opportunity in a way that delivers attractive returns for our shareowners and also appropriately benefits our system," Mr. Isdell concluded.

"This is an outstanding opportunity for both of our companies to build an expanded active lifestyle business, first in the United States and then around the world," said Muhtar Kent, president and chief operating officer of The Coca-Cola Company. "It sharpens even further our existing focus on re-establishing sustainable growth in our home market, strengthening our system, and leveraging acquisition opportunities to gain speed and capabilities in key categories. We're committed to winning by reigniting growth in our core business of sparkling beverages while becoming the fastest-growing still beverage company in North America. I am confident we have the strategy, focus and leadership team in North America to deliver on that promise.

"Glacéau and its brands also provide us with highly attractive longer-term international opportunities," Mr. Kent added. "We look forward to discussing with glacéau's distributors and our bottling partners the best operating model for glacéau's routes-to-market."

**Strategic Opportunity for Growth and Value Creation**
The Company said that the acquisition of glacéau will expand the Company's ability to meet consumers' needs further across the entire spectrum of sparkling and still beverages. With its vitaminwater, smartwater, fruitwater and vitaminenergy brands, glacéau is uniquely positioned in key market categories, with a leading position in enhanced water and attractive brands in water and energy drinks. These categories are expected to make up a large portion of the beverage industry's volume and gross profit growth in North America through 2010.

"It's a perfect match connecting the hottest active lifestyle brand with the full resources of the world's best beverage company," said J. Darius Bikoff, glacéau founder and chief executive officer. "To best understand today's announcement, you really need to go out, buy a bottle of vitaminwater and try it for yourself to see how well it works."

**Operational Structure Built for Success**
Glacéau will operate as a separate business unit within Coca-Cola North America (CCNA). This structure will allow glacéau to continue to win in the marketplace by maximizing its focus, speed, sales and execution capabilities, while leveraging the scale of CCNA's resources in supply chain, marketing and consumer insights, large customer management and foodservice.

The Company noted that glacéau's top three executives (J. Darius Bikoff, Mike Repole, and Mike Venuti) intend to lead the business for a minimum of three years, and that other key managers will remain in the business.

"Glacéau has a great and talented management team, whose brand building and creativity will complement and strengthen our business in North America," said Sandy Douglas, president and chief operating officer of Coca-Cola North America. "Operating as a separate business unit within Coca-Cola North America, glacéau will continue to focus its passion and marketing experience to create excitement with consumers and customers.

"As people head out this summer, whether they are running along the beach, hiking in the mountains, or relaxing poolside, this

# Exhibit J



# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS



| Home | Contact Us | E-Filing Services | Document Searches | Forms | H |

Previous on List    Next on List    Return To List

No Events    No Name History

Entity Name

# Detail by Entity Name

## Foreign Profit Corporation

ENERGY BRANDS INC.

## Filing Information

**Document Number** F07000005668
**FEI Number**        113322775
**Date Filed**        11/15/2007
**State**             NY
**Status**            ACTIVE

## Principal Address

17-20 WHITESTONE EXPRESSWAY
WHITESTONE NY 11357

## Mailing Address

17-20 WHITESTONE EXPRESSWAY
WHITESTONE NY 11357

## Registered Agent Name & Address

C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION FL 33324 US

## Officer/Director Detail

**Name & Address**

Title D

DOUGLAS, JR., J.ALEXANDER M
THE COCA-COLA COMPANY ONE COCA-COLA PLAZA
ATLANTA GA 30313

Title D

KELLEY, BRIAN P
THE COCA-COLA COMPANY ONE COCA-COLA PLAZA
ATLANTA GA 30313

Title D

VAN RENSBURG, DERYCK J

THE COCA-COLA COMPANY ONE COCA-COLA PLAZA
ATLANTA GA 30313

Title PCEO

BIKOFF, J. DARIUS
17-20 WHITESTONE EXPRESSWAY
WHITESTONE NY 11357

Title VPP

REPOLE, MICHAEL
17-20 WHITESTONE EXPRESSWAY
WHITESTONE NY 11357

Title SCFO

VANUTL, MICHAEL
17-20 WHITESTONE EXPRESSWAY
WHITESTONE NY 11357

## Annual Reports

**Report Year Filed Date**
**2008**        05/19/2008

## Document Images

05/19/2008 -- ANNUAL REPORT      | View image in PDF format |

11/15/2007 -- Foreign Profit      | View image in PDF format |

Note: This is not official record. See documents if question or conflict.

| Previous on List | Next on List | Return To List | |
|---|---|---|---|
| No Events | No Name History | | Entity Name |

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright and Privacy Policies
Copyright © 2007 State of Florida, Department of State.

# Exhibit K

*The Coca-Cola Company*

# Behind the Brand

2007 Year in Review
The language of refreshment



>> Learn more

## Get to Know Us

Refreshment is a language everyone understands, and no one speaks it better than Coca-Cola. Our stories from around the world in 2007 are compelling and our results are strong. While local languages may differ, the language of refreshment is universal.

Review our 2007 performance.

## Quick **Facts**

- Established: 1886
- Ranking: We own 4 of the world's top 5 nonalcoholic sparkling beverage brands
- Associates: 90,500 worldwide
- Operational Reach: 200+ countries
- Consumer Servings (per day): 1.5 billion
- Beverage Variety: more than 2,800 products

## Our Secret Formula is what sets us apart...

### TEAMWORK

Understand how we work with our bottlers to produce and distribute our beverages.

### CORPORATE RESPONSIBILITY

The Coca-Cola Company and its bottlers announce purchase and deployment of 100,000 CO2 climate-friendly coolers by the end of 2010.

Company Recognized for Response to Millennium Development Goals 'Call to Action'

### LEADERSHIP

View remarks by Neville Isdell at the 2008 Annual Meeting

Awards and Recognition

Find out how innovation drives everything we do.

### PARTNERSHIPS

Olympic Games
World Wildlife Fund
USAID

The trademarks listed are owned or used under license by The Coca-Cola Company and its related affiliates, as of December 31, 2006. These trademarks may be owned or licensed in select locations only. © 2008 The Coca-Cola Company, all rights reserved.

# Exhibit L

*The Coca-Cola Company*

# The language of refreshment

2007 Annual Review





SCER
nagpalamig التغذية restituye innovation 青春焕发
Καινοτομία rivitalizzare Ξαναζωντανε
活力を取り戻させる stärken nourish ताज़ा करना savoure
chit wiederbeleben disfruta 활력있는 MENGISI renew
energiza KEMBALI утоля







# A Letter from Our Chairman and Our President

E. NEVILLE ISDELL, CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER
MUHTAR KENT, PRESIDENT AND CHIEF OPERATING OFFICER

Muhtar (left) was born in the U.S., is of Turkish heritage and drinks Coca-Cola Classic.
Neville was born in Ireland, grew up in Africa and drinks Coca-Cola Zero.

**DEAR FELLOW SHAREOWNER:**

The year 2007 was a defining one in the great story of The Coca-Cola Company.

Our journey to becoming a sustainable growth company reached a new milestone, led by the revitalization of Trademark Coca-Cola; exciting acquisitions and joint ventures; innovative marketing initiatives; and new partnerships that advanced our global corporate citizenship.

The tireless efforts of our people and the great commitment of our bottling partners have rekindled the energy and optimism that have become synonymous with Coca-Cola. Indeed, across our entire portfolio and all our markets, we experienced a systemwide renaissance and commitment to balanced growth.

Nowhere was this energy more tangible than in the nearly 550 billion beverage servings that our consumers reached for and were refreshed by this past year.

The honor our consumers gave us by inviting us into their lives did not happen by chance. It was the sum of many things done well across the Coca-Cola system (the Company and our bottling partners).

At the heart of our progress is the recognition that delivering sustainable growth requires making every aspect of our business sustainable, from our supply chain and operating model to the citizenship and leadership we exhibit in the communities we serve.

**A STRONG YEAR**

The following pages tell the story of a company delivering consistent performance that is well-balanced across markets, categories, customers and products—a company that is moving forward with a clear strategic agenda.

In 2007, The Coca-Cola Company earned $2.57 per share, an increase of 19 percent. Unit case volume grew 6 percent. And net operating revenues grew 20 percent to $28.9 billion.

We took several key steps in 2007, including

- strengthening our sparkling portfolio with new brands and brand extensions;

- expanding our still portfolio with strategic acquisitions and innovations;

- improving our capabilities in consumer marketing, commercial leadership and franchise leadership;

- creating a more sustainable future through more efficient energy, water and operational practices.

# Exhibit M

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| B & E JUICES, INC., | : | CIVIL ACTION NO.: |
| | : | 3:07CV1321 (MRK) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| ENERGY BRANDS, INC., | : | |
| | : | |
| Defendant. | : | OCTOBER 19, 2007 |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

MCCARTER & ENGLISH, LLP

William H. Bright, Jr.
Federal Bar No.: ct 02494
Andrew D. Moore
Federal Bar No.: ct 22281
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Tel.: (860) 275-6700
Fax: (860) 724-3397

Attorneys for Energy Brands, Inc.

ME1 6838290v.1

53.    Energy Brands has never conducted any regular inspections of B&E's warehouse.
See October 12th Tr. at 436:14-23.

### B&E Does Not Brand Any Trucks with Energy Brands' Logos until 2006

54.    Energy Brands branded its first truck with an Energy Brands logo in 2006. See
October 10th Tr. at 164:25-165:4. Mr. Clyne admits that Energy Brands started asking him to
decal trucks with Energy Brands' logos in 2004, but that he refused to do it until 2006. See id. at
205:1-13.

### B&E's Truck Drivers Are Not Required to Wear Any Energy Brands Clothing

55.    Energy Brands provided clothing, including t-shirts, jackets, and hats, to B&E.
See October 12th Tr. at 443:14-16. Often, this clothing was provided upon the direct request of
B&E's subdistributors or B&E itself. See id. at 444:8-25.

56.    Energy Brands never required anyone from B&E to wear any of Energy Brands'
clothing or suggested that B&E would lose Energy Brands' business if its employees did not
wear Energy Brands' clothing. See October 12th Tr. at 445:4-10. In fact, B&E would often
decline Energy Brands' clothing if it was asked to pay for the clothing. See id. at 44:19-45:3.
Mr. Clyne admits that during the entire relationship with Energy Brands, his distributors decided
on their own what clothing to wear. See October 10th Tr. at 197:7-22.

57.    B&E's employees are often seen wearing clothing of other manufacturers, such as
Snapple and Mistic. See October 12th Tr. at 445:11-18.

### The Coca Cola Company Purchases Energy Brands, and Energy Brands Enters Into an Agreement with the Coca Cola Bottlers

58.    In June 2007, The Coca-Cola Company ("Coke") purchased the stock of Energy
Brands for approximately $4.1 billion. See October 11th Tr. at 287:9-10.

59.    Hal Kravitz, who is in charge of integrating Glaceau into the Coke system,

testified that in 2006 while working for Coca Cola Enterprises ("CCE"), the largest part of

Coke's distribution network, Coke asked him to analyze whether Energy Brands would be a

good acquisition target for Coke. See October 11th Tr. at 399:1-14. At that time, Mr. Kravitz

believed that Energy Brands was starting to hit a ceiling under its current distribution network.

See id. at 403:8-16. Mr. Kravitz testified that he believed Coke's distribution network, known as

the Coca Cola Bottlers (the "Bottlers"), would be able to expand the reach of Energy Brands'

products and that the availability of Energy Brands' products would "explode." See id. at

402:13-403:1.

      60.    At the same time, Energy Brands was also concerned about the viability of its

current distribution network. See October 11th Tr. at 359:16-8. By 2006, Cadbury-Schweppes

("Cadbury") owned approximately 40% of Energy Brands' distribution network. See id. at

357:19-22. Energy Brands was concerned that if Cadbury encountered financial difficulties or

spun off the company such that the distribution system went away, Energy Brands would be left

with no distribution system in 40% of its territories. See id. at 359:2-15.

      61.    The Bottlers are the largest distribution system in the United States. See October

11th Tr. at 339:10-18. They have more resources nationally than most of the other distribution

companies combined. See id.

      62.    For example, the Bottlers provide the following advantages over Energy Brands'

current distribution network:

- The Bottlers have 1 million coolers and 1.2 million vending machines, as compared to the 25,000 coolers and 440 vending machines utilized by Energy Brands' current distribution network. See October 11th Tr. at 340:1-10. In Fairfield County, Energy Brands has approximately 300 coolers and 25 vending machines, as compared to the thousands of coolers and vending machines owned by the Bottlers in that territory. See id. at 340:10-15;

- The Bottlers have access to food service accounts, such as McDonalds and Subway, as well as colleges and schools. See October 11th Tr. at 340:21-25, 369:17-25. For example, Subway has an exclusive deal with Coke. See id. at 341:2-7. Under the current distribution system, Energy Brands has no access to Subway. See id. at 341:8-13. With the Bottlers, Energy Brands has six SKUs authorized for Subway. See id. at 341:14-18; and

- The Bottlers can go to chain stores twice a day seven days per week, while someone at B&E could only be there once or twice per week. See October 11th Tr. at 364:4-11.

63.  Energy Brands entered into an agreement with the Bottlers to take advantage of these new accounts and channels by distributing Energy Brands' products throughout most of the United States (the "Bottlers Agreement").[4] See Defendant's Exhibits 524 (Bottlers Agreement) and 525 (Focus and Commitment Letter).

64.  Through the Bottlers Agreement, Energy Brands also obtained a number of additional distribution advantages, including the following:

- The Bottlers Agreement establishes a hybrid system whereby Energy Brands can sell products directly to certain customers, such as Trader Joe's and Whole Foods, certain food service accounts like McDonalds, and club stores. See October 11th Tr. at 372:2-17, 373:13-21, 410:22-411:12; Defendant's Exhibit 524 (Bottlers Agreement at § 2.2). Under the current system, Energy Brands had to sell through B&E. See October 11th Tr. at 373:1-5. Because some customers prefer direct delivery from Energy Brands, utilizing this system helps grow volume by getting to accounts Energy Brands would otherwise be unable to get into and by preventing out-of-stock situations. See id. at 374:23-375:8, 411:5-412:7;

- Energy Brands required all of the Bottlers to sign the same Bottlers Agreement, as opposed to different agreements for each distributor. See October 11th Tr. at 376:19-22, 410:5-8; Defendant's Exhibit 524 (Bottlers Agreement). This provides advantages in the form of simplification and consistency when negotiating with large accounts, such as chain or club stores. See October 11th Tr. at 376:23-377:13, 410:9-21; and

- The Bottlers Agreement also includes a Focus and Commitment Letter that prevents the Bottlers from carrying brands that Coke does not approve

---

[4] Energy Brands chose not to give six markets to the Bottlers for either business or legal reasons. See October 11th Tr. at 303:15-304:19, 364:25-368:18, 404:24-407:2.

of for the next three years.  See October 11th Tr. at 415:13-22;
Defendant's Exhibit 525 (Focus and Commitment Letter).

## Energy Brands Terminates B&E

65.    Prior to Coke's June 2007 purchase of Energy Brands, Mr. Repole advised Mr.

Clyne that there was a plan in place for Energy Brands to utilize the Bottlers.  See October 10th

Tr. at 113:12-25; October 11th Tr. at 297:1-8.

66.    On August 30, 2007, Energy Brands notified B&E by letter that it was exercising

its contractual right to terminate the Agreement effective November 2, 2007.  See Plaintiff's

Exhibit 1 (Agreement at § 11.4).  This notice complies with the 60-day notice requirement set

forth in Section 11.4 of the Agreement for terminations without cause.  See Plaintiff's Exhibit 1

(Agreement at § 11.4).  The first paragraph of this termination letter advised B&E of the reasons

for the termination:

> Please be advised that EBI has decided to change the distribution network in your
> territory and surrounding area and therefore will be terminating the above-
> referenced Agreement.  In connection therewith, this letter shall constitute the
> written notice of the termination of the Agreement.  As such, please take note that
> the Agreement shall be deemed terminated and of no further force and effect as of
> Friday, November 2, 2007 (the 'Termination Date').

See Plaintiff's Exhibit 296 (termination letter) (emphasis added).

67.    Mr. Clyne admits that when he received the termination letter, he knew that B&E

was losing Energy Brands' business because Energy Brands was transitioning to the Bottlers.

See October 10th Tr. at 132:18-21.  Mr. Repole previously advised Mr. Clyne that this would be

happening.  See October 11th Tr. at 297:6-8.

68.    Mr. Clyne admits that Coke will save money by terminating the current

distributors, including B&E, and using the Bottlers.  See October 11th Tr. at 277:20-278:2.  He

also admits that Coke will make more money by terminating B&E and utilizing the Bottlers.  See

ME1 6838290v.1

19

# Exhibit N



MEET AMERICA'S
BEST GYMNASTS

CLICK HER



the power of place

Tuesday, August 5, 2008

PLACE SEARCH

Enter a community name     State: New Yor

☐ Include former names     Go To: Advanced

## WHITESTONE COMMUNITY PROFILE

New York > All counties > Queens County > Whitestone

**QUICK LINKS**

Essentials
Attractions
Cemeteries
Census
Historical
societies
Housing
Libraries
People
Travel

# Whitestone, New York

Send us your Whitestone photos:

[ Browse... ]  [ Send ]

**Tell us the pros & cons of Whitestone
Blog about Whitestone**

## Whitestone 

Whitestone is a neighborhood of Queens.

The community was named for rock at point where tides met from the East River and Long Island Sound
Elevation is 49 feet.

Bounded by the East River,
Clearview Expressway, Bayside
Avenue, 29th Avenue and
Whitestone Expressway.

Former and merged names
include:
· Clintonville

Boomed after construction of a
stamping mill in 1854

**Well-known residents have
included:**
· Francis Lewis, signer of the
Declaration of Independence

**ESSENTIALS**

**EMPLOYMENT:**
  Local jobs
  Post a job
**HOUSING:**
  Find Foreclosure
  Local homes for sale
**LODGING:**
  Nearby hotels
**RECORDS:**
  Birth, marriage & death
  Court, land & probate
  Military

**Coffee:** National and regional coffee companies with outlets here include
Starbucks
**More info about local coffee quotients**

## Ads by Google

REAL ES

Homes for sale in White
Find a Whitestone Real
What's your home worth
Check New York mortga
Obtain a property report
Obtain a neighborhood
Get your credit report
Find Foreclosure in Whi

EPODUNK USER

Visit the Reader Blo
Visit the ePodunk Bl

Register for My ePo

Tell us the pros & co
Blog about Whitesto

LOCA

More info about Whitestor

Ancestry & family histo
Business
Health
Housing
Politics
Sports & rec

RECORE

Birth & death
Census
Court & land
Family history
Immigration
Military
Newspapers
Obituaries
People search

# Exhibit O

judges make in deciding cases). Click here for a link to the rules that explain what may be complained about, who may be complained about, where to file a complaint, how the complaint will be processed, and the form you must use to file a complaint.

**On-line Attorney Admissions** are now available. Click here for access. and here for instructions

# Welcome to the United States District Court for the Eastern District of New York. The Eastern District has 14 Active Judges, 11 Senior Judges and 16 Magistrate Judges. The district comprises the counties of Kings, Nassau, Queens, Richmond, and Suffolk and concurrently with the Southern District, the waters within the counties of Bronx and New York. The Eastern District has a population of eight million people.

The main courthouse, located at 225 Cadman Plaza East, is in the civic center of Brooklyn and is directly adjacent to Brooklyn Heights, the first Historic District named as such in the City of New York. Only a short distance from the courthouse's current location is the site of Gen. George Washington's escape to Manhattan during the American Revolution, an escape that ensured a later victory for his army. Cadman Plaza, itself was named after Samuel Parkes Cadman, a popular Brooklyn Minister in the early twentieth century who was one of the first to use radio as means to reach his audience.

The court has completed its expansion and modernization. The low-rise wing of the complex has been removed and a larger facility, designed by the world-renowned architect, Cesar Pelli, the designer of the Ronald Reagan Washington National Airport and the World Financial Center, has been completed to meet the growing mission of the Judiciary in its service to the public.

The Divisional Office is located in Central Islip, Suffolk County, on Long Island. It is situated near Hecksher State Park, the Connetquot River State Park Preserve, Bayard Cutting Arboretum State Park, and the Caleb Smith State Park Preserve. The Courthouse in Central Islip was designed by Richard Meier with ground breaking on July 22, 1997. Construction completed in the Summer of 2000. It is the second largest courthouse in the country and the largest structure on Long Island. The courthouse accommodates the District Court, the Bankruptcy Court, Pretrial Services and Probation Department as well as the US Marshal's Service, US Attorney's Offices and several State Court offices.

   

Home          Disclaimer          Security & Privacy          Help Desk

For information or comments about this Web site, please contact: webmaster@nyed.uscourts.gov
This e-mail address should NOT be used for inquiries regarding cases, opinions, photocopies or other types of information requests; however, comments on or suggestions for this Web site are welcome.
Designed and Maintained by: U.S. District Court - Eastern New York, Systems Dept.

6/3/2008

# Exhibit P



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | H |

Previous on List    Next on List    Return To List

Events         No Name History                                    Entity Name

# Detail by Entity Name

## Foreign Profit Corporation

THE COCA-COLA COMPANY

## Filing Information

| | |
|---|---|
| **Document Number** | 814956 |
| **FEI Number** | 580628465 |
| **Date Filed** | 01/03/1961 |
| **State** | DE |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 06/05/1990 |
| **Event Effective Date** | NONE |

## Principal Address

ONE COCA-COLA PLAZA, NW
C/O TAX DEPT., P.O. DRAWER 1734 NAT 1148
ATLANTA GA 30313-2419

Changed 06/24/1991

## Mailing Address

ONE COCA-COLA PLAZA, NW
C/O TAX DEPT., P.O. DRAWER 1734 NAT 1148
ATLANTA GA 30313-2419

Changed 06/24/1991

## Registered Agent Name & Address

CT CORPORATION SYSTEM
1200 S. PINE ISLAND ROAD
PLANTATION FL 33324

Name Changed: 06/26/1992

Address Changed: 06/26/1992

## Officer/Director Detail

**Name & Address**

Title CCEO

# Exhibit Q

1. Sinaltrainal v. Coca-Cola Co., CASE NO.: 01-3208-CIV-MARTINEZ/DUBE, CASE NO.: 02-20258-CIV-MARTINEZ/DUBE, CASE NO.: 02-20259-CIV-MARTINEZ/DUBE, CASE NO.: 02-20260-CIV-MARTINEZ/DUBE, UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, 2003 U.S. Dist. LEXIS 7136; 16 Fla. L. Weekly Fed. D 388, March 28, 2003, Decided , March 31, 2003, Filed , Motion granted by, in part, Motion denied by, Motion granted by, in part, Motion denied by, in part In re Sinaltrainal Litig., 2006 U.S. Dist. LEXIS 95530 (S.D. Fla., Sept. 29, 2006)
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...

2. Sinaltrainal v. Coca-Cola Co., CASE NO.: 01-3208-CIV-MARTINEZ/DUBE, CASE NO.: 02-20258-CIV-MARTINEZ/DUBE, CASE NO.: 02-20259-CIV-MARTINEZ/DUBE, CASE NO.: 02-20260-CIV-MARTINEZ/DUBE, UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, 256 F. Supp. 2d 1345; 2003 U.S. Dist. LEXIS 7145; 16 Fla. L. Weekly Fed. D 382, March 28, 2003, Decided , March 31, 2003, Filed , Motion denied by Sinaltrainal v. Coca-Cola Co., 2003 U.S. Dist. LEXIS 7136 (S.D. Fla., Mar. 28, 2003)
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...
... Plaintiffs, vs. THE COCA-COLA COMPANY, et al., ...

3. Coca-Cola Foods v. Empresa Comercial Internacional de Frutas, S.A., Case No: 96-358-Civ-T-17C, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 1997 U.S. Dist. LEXIS 9295; 11 Fla. L. Weekly Fed. D 28, June 12, 1997, Decided
COCA-COLA FOODS, a division of THE COCA-COLA CO., Plaintiff, vs. ...

4. Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S.A., CASE NO. 96-358-CIV-T-17C, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 941 F. Supp. 1182; 1996 U.S. Dist. LEXIS 15130; 10 Fla. L. Weekly Fed. D 298, October 7, 1996, Decided , October 7, 1996, FILED
COCA-COLA FOODS, a division of THE COCA-COLA COMPANY, Plaintiff, v. ...

5. Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S A., CASE NO. 96-358-CIV-T-17C, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 941 F. Supp. 1175; 1996 U.S. Dist. LEXIS 14801; 10 Fla. L. Weekly Fed. D 275, September 27, 1996, Decided , September 27, 1996, FILED
COCA-COLA FOODS, a division of THE COCA-COLA COMPANY, Plaintiff, v. ...

6. Coca-Cola Co. v. Empresa Comercial Internacional de Frutas S.A., Case No. 96-358-CIV-T-17C, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 1996 U.S. Dist. LEXIS 9389; 10 Fla. L. Weekly Fed. D 60, July 1, 1996, Decided , July 1, 1996, FILED
THE COCA-COLA COMPANY, Plaintiff, vs. ...

7. Avila v. Coca-Cola Co., Case No. 82-352-CIV-ORL-19, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, 728 F. Supp. 685; 1989 U.S. Dist. LEXIS 15819; 51 Fair Empl. Prac. Cas. (BNA) 1615; 54 Empl. Prac. Dec. (CCH) P40,096, October 2, 1989, Decided
... Plaintiff, v. THE COCA-COLA COMPANY, a Delaware ...

8. WARNER v. COCA-COLA CO., Case No. 86-873-Civ-Orl-19, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, 1988 U.S. Dist. LEXIS 9432; 45 Empl. Prac. Dec. (CCH) P37,804, January 25, 1988, Decided
... Plaintiff, v. THE COCA-COLA COMPANY, a foreign ...

9. Sierra Club v. Coca-Cola Corp., Civil Action Nos. 84-827-Civ-T-15, 84-1021-Civ-T-15, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 673 F. Supp. 1555; 1987 U.S. Dist. LEXIS 10129, September 24, 1987, Filed
... Plaintiff, v. The Coca-Cola Corporation, Defendant. ...

10. Miami Coca-Cola Bottling Co. v. Orange-Crush Co., No. 281, District Court, S.D. Florida, 291 F. 102; 1923 U.S. Dist. LEXIS 1379, June 7, 1923
MIAMI COCA-COLA BOTTLING CO. v. ...

# Exhibit R

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
www.debevoise.com

David H. Bernstein
Partner
Tel 212 909 6696
Fax 212 521 7696
dhbernstein@debevoise.com

May 19, 2008

BY FEDERAL EXPRESS

Ms. Vickie L. Hilden
National Beverage Corp.
One North University Drive, #A400
Fort Lauderdale, Florida 33324

**Infringement of vitaminwater Trade Dress**

Dear Ms. Hilden:

We represent Energy Brands Inc. d/b/a Glacéau, which manufactures and markets the well-known **vitamin**water brand of enhanced water. We write to object to the trade dress of your water product Àsanté.

Glacéau pioneered the enhanced water category when it launched the **vitamin**water brand in 1999. Glacéau remains the market leader in the category it created, and the phenomenal success of the brand has always been driven by its unique and distinctive package and label design, known as "trade dress." The trade dress of **vitamin**water, which is registered with the United States Patent & Trademark Office (United States Trademark Registration No. 2,975,087), is one of the most important ways in which consumers identify the brand on the shelf or in the hands of celebrities and other consumers, and it thus is among Glacéau's most valuable intellectual property rights.



As shown at right, your water product, Àsanté, shares a number of design elements in common with the trade dress of **vitamin**water. Both products (i) are packaged in nearly identical bell-shaped plastic bottles, (ii) feature a similar vertical presentation of words (in the example at right, **vitamin**water versus CLARITY), (iii) feature a two-toned look, with one color in white and the other color generally matching the color of the water and (iv) include a clear cap. The products also share an overall clinical, or health-conscious, look.

Ms. Vickie L. Hilden                        2                         May 19, 2008

In light of these similarities (and given the limitless number of ways in which your product could have been differently dressed, as many other enhanced beverage products are), Glacéau is concerned that consumers seeing your product will believe that Àsanté beverages are associated with Glacéau or its **vitamin**water line of enhanced water beverages.

To be fair, your product is not the first that has copied elements of the trade dress of **vitamin**water. Given the success of the **vitamin**water brand, which has been fueled by its distinctive trade dress, Glacéau has faced a number of competitors through the years who have attempted to copy elements of its trade dress. In every case, though, Glacéau has contacted the competitor to discuss its concerns, and the parties usually have been able to reach an amicable resolution, with appropriate changes made to the trade dress. In the few cases where the parties could not agree, Glacéau has been forced to take the dispute to court, including cases against Pepsico, Arizona, and Consac. Each of those lawsuits ended with an injunction against the confusing trade dress or an agreement to withdraw the infringing trade dress from the market. *See Energy Brands Inc. v. Beverage Marketing USA, Inc.*, No. 02 Civ. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) (temporary restraining order ("TRO") granted against infringing trade dress of Arizona WaterAid+); *Energy Brands Inc. v. Consac Indus., Inc.*, No. 02 Civ. 3594 (DAB) (S.D.N.Y. May 15, 2002) (TRO granted against infringing trade dress of Enhance); *Energy Brands Inc. v. Pepsico, Inc.*, No. 06 Civ. 2662 (SAS) (S.D.N.Y. filed Apr. 5, 2006) (settlement, immediately following TRO hearing, pursuant to which Pepsico agreed to change trade dress of Life Water) (discussed in *Beverage Business Insights*, Vol. 3, No. 33 (May 2, 2006) and No. 35 (May 5, 2006)).



The Arizona case is particularly instructive because, as shown at right, the trade dress for your Àsanté product shares many of the trade dress elements of WaterAID+ that led to the entry of an injunction. Both products copy the bell-shaped bottle design of **vitamin**water, feature a two-toned look with white and a second color that matches the color of the water, use a vertical color band with the name of the product or flavor, and have a clinical, health-oriented feel. Significantly, the court found that the trade dress was likely to cause confusion notwithstanding the prominent use of the Arizona trademark on the label, bottle and cap. For all the same reasons, Glacéau is concerned that your Àsanté product also is likely to confuse consumers, notwithstanding the prominent use of the Àsanté name on the label.

Ms. Vickie L. Hilden                        3                        May 19, 2008

In light of its concerns, Glacéau has asked us to contact you to determine whether this dispute amicably can be resolved. If you are prepared to make appropriate changes to the trade dress of Asanté and to agree not to adopt any other trademark or trade dress confusingly similar to **vitamin**water's, then Glacéau is prepared to discuss an appropriate transition period for the changes. If not, Glacéau expressly reserves its right to seek judicial intervention. If Glacéau is forced to pursue that route, it could not only seek an injunction against any use of the infringing trade dress, but also could seek a recall of all products already in the marketplace and damages for your past sales.

We would appreciate receiving your written response no later than May 28, 2008. If we do not hear from you or your counsel by then, we will assume that you have no intention of complying with Glacéau's requests and will advise Glacéau to proceed accordingly.

Very truly yours,

David H. Bernstein

cc:  Joseph Di Salvo, Esq., Glacéau
     Caroline Pearlstein, Esq., Coca Cola Co.

22735346v1

# Exhibit S

National
Beverage
Corp.

One North University Drive
PO Box 16720
Fort Lauderdale, Florida 33324

Fax: (954) 473-4710
Web: http://www.nbcfiz.com

America's
Flavor
Choice

May 20, 2008

David H. Bernstein
Debevoise & Plimpton, LLP
919 Third Avenue
New York, NY 10022

Re:     **vitamin**water brand

Dear Mr. Bernstein:

Thank you for your letter dated May 19, 2008.  We are looking in to your client's objection to the trade dress of the Ásanté brand and will provide a full response to your letter shortly.

Regards,

Vickie L. Hilden



# Exhibit T





# Exhibit U

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-60792-CIV-ALTONAGA/BROWN

NATIONAL BEVERAGE CORP.,
a Delaware corporation,

                    Plaintiff,

v.

ENERGY BRANDS, INC. d/b/a GLACEAU,
a New York corporation,

                    Defendant.
_____

## DECLARATION OF CAROL DOLLARD IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY OR TRANSFER

I, Carol Dollard, hereby declare as follows:

1.       I am the Chief Operating Officer and a Senior Vice President of Defendant Energy Brands Inc. d/b/a Glacéau ("Glacéau") and the business person at Glacéau in charge of supervising potential trade dress infringements. I also am familiar with the business and promotional activities of Glacéau, including with respect to our VITAMINWATER® nutrient enhanced water beverages.

2.       I submit this declaration based on personal knowledge or my review of Glacéau's business records in support of Glacéau's motion to dismiss the Florida action or, alternatively, to stay the Florida action pending resolution of the New York action or transfer this action to the United States District Court for the Southern District of New York.

3.       I have worked at Glacéau since May 2002. Until late last year, Glacéau was a company mostly owned by the Bikoff family, as well as friends and employees of Glacéau. In late 2007, The Coca-Cola Company purchased Glacéau. However, The Coca-Cola Company did not merge Glacéau into its corporation; instead, Glacéau (formerly known as Energy Brands Inc.) remains a separately-incorporated company, incorporated in the State of New York, which operates as an independent business unit. Moreover, all of Glacéau's senior executives (including its Chief Executive Officer, President, Chief Financial Officer, Chief Operating

1

Officer, Senior Vice President of Marketing, and General Counsel) have stayed with the company, and we still run Glacéau out of our offices in New York City.

4.     During the twelve month period ending April 28, 2007, Glacéau's revenues were approximately $400 million. I understand that National Beverage reported revenue of $539 million during that same period.

5.     Glacéau first learned of the ÀSANTÉ product late on Friday, April 25, 2008, when one of our district sales managers, Conor Woulfe, reported seeing the product in a Shell gas station in Maryland. Attached as Exhibit A is Mr. Woulfe's email. The following week, we received samples of the product from Mr. Woulfe. Subsequently, we received a copy of a promotional flyer for ÀSANTÉ, showing that it is sold to retailers in cases of 24 bottles each. *See* Exhibit B.

6.     It is my understanding that plaintiff National Beverage Corp. alleges that Glacéau unreasonably delayed in challenging the ÀSANTÉ product because Glacéau must have seen the announcement of Àsanté in the November-December 2007 issue of *Beverage Spectrum*. *See* Exhibit C. I have no personal recollection of having seen this announcement. I also have asked the other senior executives of Glacéau whether they recall seeing the article in *Beverage Spectrum*; they, too, have no recollection of seeing the article or hearing about the ÀSANTÉ product prior to Mr. Woulfe's email of April 25, 2008.

7.     Until Mr. Woulfe's email, no one at Glacéau raised any objection or concern with me about the appearance of the ÀSANTÉ product in the November-December 2007 issue of *Beverage Spectrum*. I have checked with Glacéau's General Counsel, Joseph Di Salvo, and he confirms that, until Mr. Woulfe's email, no one raised any issue about the ÀSANTÉ product with him either.

8.     Even if I had seen the announcement about the ÀSANTÉ product at that time, it probably would not have raised much concern because (1) many competitive enhanced water products are announced in the media that do not gain any traction in the marketplace, and Glacéau typically investigates new products before deciding whether to initiate a challenge, (2) the image shown in the magazine shows a label with a white and green color scheme for a

2

# **EXHIBIT A**

**From:** Conor Woulfe
**Sent:** Friday, April 25, 2008 4:29 PM
**To:** Joseph Serventi
**Cc:** Brian Camus; Daniel Baumwald
**Subject:** new(to me) knockoff...."asante"

sup kid,

i was filling up at a shell gas station and found this new knockoff. it is definitely the worst tasting one yet. only one facing of their citrus flavor, set near lifewater, but their website lists many more. have you guys heard any info about this?

i will ship it to you this weekend.

pics attached. have a good one.

conor woulfe
glacéau
district sales manager
p. 410.963.6799
www.drinkbetterwater.com

*********************************************************

this email and any files transmitted with it are confidential and are intended for the sole use of the individual to whom they are addressed. glaceau reserves the right to scan all e-mail traffic for restricted content and to monitor all e-mail in general. if you are not the intended recipient or you have received this email in error, any use, dissemination or forwarding of this email is strictly prohibited. if you have received this email in error, please notify the sender by replying to this email.

# EXHIBIT B

Customer_____    Acct#_____
Order date:                                 Delivery date:

# Asante

nutritionally enhanced flavored vitamin water
24/20oz PET botties

pre-priced .99 for FAST sales!
$15.99/case

## SPECIAL INTRO OFFER!*



**5-case deal –
buy 4 and get
1 more FREE!**
(must take 5 flavors)

**8-case deal –
buy 6 and get
2 more FREE!**
(must take 8 flavors)
net bottle cost = .50

(discount code 200)

___ 3801 Citrus – Stamina

___ 3802 Mandarin Orange – Immune

___ 3803 Fruit Punch – Clarity

___ 3804 Pomegranate – Energy

___ 3805 Kiwi Strawberry – Replenish

___ 3806 Cranberry – Antioxidant

___ 3807 Pineapple Passionfruit – Longevity

___ 3808 Blueberry – Nourish

Total _4_

*Offer good only for 1ˢᵗ-time buyers of Asante  Must take 5 flavors for 4+1 Free offer.  Must take all 8 flavors for 6+2 Free offer.  No doubling.

**Swartz & Sons Distributors, Inc MD, DC, VA (301)927-8566    Baltimore (410)288-1005**

# Exhibit V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-60792-CIV-ALTONAGA/BROWN

NATIONAL BEVERAGE CORP.,
a Delaware corporation,

        Plaintiff,

v.

ENERGY BRANDS INC. d/b/a GLACEAU,
a New York corporation,

        Defendant.

---

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY OR TRANSFER (DE 5)

       In its opposition papers, National Beverage makes the incredible assertion that it "did not file this action in anticipation of imminent litigation." DE 30 at 13. The incontrovertible facts and evidence are all to the contrary. National Beverage's complaint was not only a blatant anticipatory filing, but also, it was filed just three days after National Beverage sent a misleading letter to Glacéau promising to "provide a full response to [Glacéau's May 19, 2008] letter shortly." DE 6, Ex. C. National Beverage's letter's true intent appears to have been to deceive Glacéau into believing that National Beverage intended to enter into good faith discussions with Glacéau while instead providing National Beverage with the time it needed to rush its anticipatory declaratory judgment complaint on file. Moreover, it appears that National Beverage intended to keep its filing secret from Glacéau; it was only after the media reported that National Beverage filed a declaratory judgment complaint against Glacéau that National Beverage contacted Glacéau's counsel and served the complaint on Glacéau's registered agent in Plantation, Florida. Significantly, more than six weeks later, and despite its promise of a "full response . . . shortly," National Beverage has yet to respond to Glacéau's May 19th letter.

       These facts alone are determinative of this motion. Because National Beverage's complaint is exactly the kind of "declaratory complaints filed in anticipation of a suit and used to forum shop" that should "be actively discouraged," *Gen. Star Indem. Co. v. Puckit, L.C.*, 818 F. Supp. 1526, 1532 (M.D. Fla. 1993), and because National Beverage secretly filed its lawsuit "while giving the impression ... that it was making its best efforts to negotiate a settlement,"

1

*Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1193-94 (E.D. Cal. 2006), this Court should dismiss the anticipatory complaint outright and allow the New York litigation to proceed.

In an effort to avoid dismissal (or stay or transfer), National Beverage recites a litany of objections, facts and arguments that are either misleadingly presented or simply irrelevant:

- It suggests that New York is an inappropriate forum because it has limited contacts with that state, even though it admits that *it has sold more than 10,000 bottles of ÀSANTÉ in New York*.

- It casts this dispute as a David versus Goliath tale, characterizing itself as a "small," Plantation-based company despite its *annual revenues of more than half a billion dollars*, and inaccurately claiming that Glacéau is "directed from Atlanta" and is really a stalking horse for The Coca-Cola Company. In fact, Glacéau is a *separately incorporated* company, which had revenues of about $400 million during the same period, and which continues to be *run out of New York City* by its New York City-based management and legal team. Declaration of Carol Dollard ("Dollard Decl."), filed contemporaneously as DE__, ¶¶ 3-4.

- It implies that Glacéau filed suit in an improper jurisdiction only because it is "convenient to its counsel," when, in fact, Glacéau filed its suit in one of the two federal districts in New York City, in a courthouse just 13 miles from its headquarters, and in the New York City district with the most experience in trademark litigation. The filing in Manhattan was wholly appropriate, just as National Beverage was also within its right to bypass the Fort Lauderdale division of this Court, which is closest to its Plantation offices, and instead file its suit in the Miami division, the courthouse closest to *its counsel's* offices.

- It erroneously asserts that Glacéau acted improperly in delaying this challenge until the start of the summer season and then launching the challenge in a way designed to publicly interfere with National Beverage's launch of ÀSANTÉ. In fact, *Glacéau first learned of ÀSANTÉ's trade dress infringement in late April 2008*; moreover, the only reason this case has obtained any public attention is because *National Beverage* filed suit instead of responding privately to Glacéau's non-public letter.

For these reasons, and the other reasons discussed in Glacéau's moving papers and below, Glacéau respectfully requests that the Court grant this motion to dismiss National Beverage's anticipatory complaint, or at least stay or transfer this action.

*Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999) (affirming dismissal of first-filed declaratory judgment complaint where declaratory judgment plaintiff "paced to the courthouse to usurp [declaratory judgment defendant's] forum choice"); *Xoxide, Inc.*, 448 F. Supp. 2d at 1192-94 (dismissing first-filed action that was "anticipatory and an improper attempt at forum shopping; the Court will not give such a suit the deference ordinarily reserved for first-filed actions"); *Buzas Baseball, Inc. v. Bd. of Regents*, No. 98-4098, 1999 U.S. App. LEXIS 21630, at *7-8 (10th Cir. 1999); *Ven-Fuel, Inc.*, 673 F.2d 1194; *Lewis v. Nat'l Football League*, 813 F. Supp. 1, 4-6 (D.D.C. 1992).

Because it recognizes the importance of this factor to the determination of this motion, National Beverage claims that it was *not* engaged in forum-shopping and did *not* file this action in anticipation of litigation. DE 30 at 1 ("Glaceau wrongly accuses National Beverage of forum-shopping"), 13 ("National Beverage did not file this action in anticipation of imminent litigation"). Those assertions cannot be squared with the incontrovertible facts and admissions.

The chronology of events and the allegations in National Beverage's own complaint make clear that the declaratory judgment complaint *was* filed in direct response to Glacéau's threat of litigation. *See* DE 5 at 3-9. As National Beverage noted in its complaint, "[t]he May 19, 2008 letter specifically state[d] that unless Plaintiff makes appropriate changes to its trade dress, Defendant reserves its right to seek judicial intervention." Complaint ¶ 38. In fact, Glacéau's letter said more: It detailed the past litigations filed by Glacéau in the Southern District of New York, included color photographs comparing the ÀSANTÉ trade dress with the ARIZONA trade dress already enjoined by the New York court, and concluded by threatening that Glacéau "could not only seek an injunction against any use of the infringing trade dress, but also could seek a recall of all products already in the marketplace and damages for your past sales." DE 6, Ex. B. As the complaint admits, these "threats of litigation" "create[d] a reasonable apprehension by Plaintiff that Defendant *will file a lawsuit* against Plaintiff." Complaint ¶¶ 41, 43-44, 47, 49-50 (emphasis added).

Moreover, despite telling Glacéau's counsel on May 20 that it would "look[] in to your client's objection to the trade dress of the Àsanté brand and will provide a full response to your letter shortly," National Beverage instead filed its complaint just three days later. National Beverage's mad rush to the courthouse further demonstrates the anticipatory nature of its

4

complaint.[1]

In the face of these facts, National Beverage tries to argue that is complaint was not anticipatory because it was filed five months after it launched ÀSANTÉ and because "it was puzzled by the delay in Glacéau's objection to its packaging." DE 30 at 13-14. That argument is a non-sequitur. Whether National Beverage's complaint was anticipatory is measured against when it filed as compared to Glacéau's demand letter, not as compared to the launch of its own product. Here, the complaint was filed four days after receipt of Glacéau's letter, a fact that conclusively demonstrates that the complaint was filed in direct response to Glacéau's threat and in anticipation that Glacéau was going to file suit in the Southern District of New York. Moreover, if National Beverage was "puzzled," it could have sought clarification by responding to Glacéau rather than by running to court. Had it done so, it would have learned that Glacéau's management did not notice the announcement of ÀSANTÉ in the November-December 2007 issue of *Beverage Spectrum*[2] and, in fact, first learned of the ÀSANTÉ product late on Friday, April 25, 2008, when one of its district sales managers reported seeing the product in a gas station. Dollard Decl. ¶¶ 5-7, Ex. A. Samples of the product were not received at Glacéau's

---

[1]    Although National Beverage filed its declaratory judgment complaint on May 23, 2008, it did not notify Glacéau's counsel or serve the complaint at that time. Instead, National Beverage sat silently on the complaint, apparently intending to keep it in its "hip pocket" while it negotiated with Glacéau. *See Remington Arms Co.*, 2004 U.S. Dist. LEXIS 3848, at *7 (first-to-file rule did not apply when plaintiff filed a "hip pocket" action and waited to serve the complaint until after the second suit was filed in an effort to gain priority); *Xoxide, Inc.*, 448 F. Supp. 2d at 1193-94 (declaratory judgment filing found to be anticipatory where the declaratory judgment plaintiff responded to letter from trademark holder "by secretly filing a lawsuit ... while giving the impression ... that it was making its best efforts to negotiate a settlement"); *Lexington Ins. Co.*, 1996 U.S. Dist. LEXIS 11694, at *5-10 (dismissing anticipatory declaratory judgment action where declaratory judgment plaintiff did not tell declaratory judgment defendant about its filing). National Beverage's secret was uncovered, though, on May 27, 2008, when the national media reported the filing of the complaint. DE 6, Ex. D. At that point, Glacéau learned about the Florida action, and proceeded to file its complaint in New York. DE 6, Ex. F. It was only *after* Glacéau filed its New York action that National Beverage effectuated service by delivering the complaint by hand on Glacéau's registered agent, CT Corporation System, at its Plantation, Florida offices, on May 29, 2008, nearly a week after it filed the complaint. DE 6, Ex. E. *See St. Paul Fire and Marine Ins. Co. v. Christensen Shipyards, Ltd.*, No. 06-21133-CIV-ALTONAGA/Turnoff, 2006 U.S. Dist. LEXIS 66531, at *9 (S.D. Fla. Aug. 28, 2006).

[2]    Carol Dollard, Glacéau's Chief Operating Officer and the person at Glacéau in charge of supervising potential trade dress infringements, has no personal recollection of having seen the article, and reports that the other senior executives have similarly told her that they do not recall seeing that article. In any event, even if one of them had seen the article, it would not have raised any concern because (1) many competitive enhanced water products are announced in the media that do not gain any traction in the marketplace, and Glacéau typically investigates new products before deciding whether to initiate a challenge, (2) the image shown in the magazine does not appear to raise heightened trade dress concerns because the color on the label does not match the color of the water (unlike all of the other ÀSANTÉ products) and so the image did not make clear the two-toned, matching-color nature of the trade dress, and (3) there is no indication that the product used the infringing phrase "VITAMIN WATER" on the label since the label text was essentially illegible and the article next to the picture describes the product as "nutritionally Enhanced Flavored Waters." Dollard Decl. ¶¶ 6-8, Exs. C-D.

- It is not true that there has been more "movement" in the Florida case than in the New York case. *See* DE 30 at 15. The only substantive "movement" in the Florida case is this motion to dismiss; it is circular reasoning to suggest that the filing of the motion to dismiss mitigates against granting of that motion. The only other "movement" in this case has been all of the flurry surrounding the Court's status conference, held on June 23, but that "movement" was largely engineered by National Beverage through its request for an "urgent" status conference. DE 13-16, 20-21. Ultimately, that conference was largely procedural in nature; the only issue of any substance was National Beverage's request for a protective order against "pre-trial publicity," which request was denied by the Court. Meanwhile, the New York action is proceeding apace: Judge Rakoff has ordered the parties to submit a case management plan by July 24, 2008, has scheduled a case management conference for July 31, 2008 and has ordered that the case be ready for trial by December 30, 2008.[4]  Declaration of S. Zev Parnass ("Parnass Decl."), filed contemporaneously as DE __, ¶ 7, Ex. G.

- National Beverage makes much of the fact that Glacéau's headquarters are located in Queens County, New York, which falls within the Eastern District of New York. *See, e.g.*, DE 30 at 1-2, 6, 10, 18. There is, however, nothing nefarious or improper about Glacéau's filing in the Southern District of New York, which also is part of New York City.[5]  The Southern District courthouse in Manhattan is located 13.33 miles from Glacéau's headquarters in Queens; the Eastern District of New York courthouse in Brooklyn is essentially the same distance (it is 13.36 miles from Glacéau's offices).[6] Parnass Decl. ¶ 4, Exs A-B. This case certainly is not like *Cellularvision Tech. & Telecomm., L.P.,* in which plaintiff sued in Florida, more than a thousand miles from its

---

[4]  National Beverage makes much of the fact that its time to answer the New York complaint has been extended to August 1, 2008. As mentioned briefly at the June 23, 2008 conference, Tr. at 7:7-18, Glacéau agreed to that date because it understood that the extension would be used to give the parties "breathing room" to try to negotiate a resolution. In that connection, Glacéau proposed several dates in late June and early July when its executives were prepared to meet; National Beverage has yet to respond or propose any dates for a settlement meeting.

[5]  New York City, which consists of five boroughs, encompasses two federal judicial districts. Manhattan and The Bronx fall within the Southern District of New York, whereas Queens, Brooklyn and Staten Island lie within the Eastern District of New York. Parnass Decl. ¶ 3.

[6]  It is ironic that National Beverage criticizes Glacéau's choice of courthouse when it chose to file its complaint in Miami (which is closest to its counsel's offices) rather than in Fort Lauderdale, which is the courthouse closest to National Beverage's headquarters and is almost 20 miles closer. *See* Parnass Decl. Exs. E-F. Glacéau does not suggest that there is anything improper in National Beverage's decision to file in Miami. Just as Glacéau may properly file its litigations in Manhattan, so may National Beverage elect to file its litigations in Miami.

22763242v6